# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARTER ADVANCED SERVICES (MN), LLC, and CHARTER ADVANCED SERVICES VIII (MN), LLC, | Case No. 15-cv-3935 (SRN/HB) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION** |
| BEVERLY JONES HEYDINGER, in her official capacity as Chair of the Minnesota Public Utilities Commission; NANCY LANGE, in her official capacity as Commissioner of the Minnesota Public Utilities Commission; DAN LIPSCHULTZ, in his official capacity as Commissioner of the Minnesota Public Utilities Commission; JOHN TUMA, in his official capacity as Commissioner of the Minnesota Public Utilities Commission; and BETSY WERGIN, in her official capacity as Commissioner of the Minnesota Public Utilities Commission, | |
| Defendants. | |

David A. Handzo and Luke Platzer, Jenner & Block LLP, 1099 New York Avenue NW, Suite 900, Washington, DC 20001; and Steve W. Gaskins, Gaskins Bennett Birrell Schupp, LLP, 333 South Seventh Street, Suite 3000, Minneapolis, MN 55402; for Plaintiffs

Andrew Tweeten, Minnesota Attorney General's Office, 1100 Bremer Tower, 445 Minnesota Street, St. Paul, MN 55101; and Elizabeth M. Jones, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, St Paul, MN 55101; for Defendants

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. No. 14].  Defendants Beverly Jones Heydinger, Nancy Lange, Dan Lipschultz, John Tuma, and Betsy Wergin, in their official capacities as Chair and Commissioners of the Minnesota Public Utilities Commission, move to dismiss Plaintiffs Charter Advanced Services (MN), LLC and Charter Advanced Services VIII (MN), LLC's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  The motion was referred to the undersigned by the Honorable Susan Richard Nelson, United States District Judge, in an Order of Referral dated November 23, 2015.  (Order at 1 [Doc. No. 21].)

## I.    Allegations in the Complaint

Plaintiffs Charter Advanced Services (MN), LLC, and Charter Advanced Services VIII (MN), LLC (collectively "Charter Advanced") are subsidiaries of Charter Communications, Inc. ("Charter"), a national communications company that provides services such as interconnected Voice over Internet Protocol ("VoIP") through its affiliates.  (Compl. ¶¶ 9, 17 [Doc. No. 1].)  Defendant Beverly Jones Heydinger is the Chair of the Minnesota Public Utilities Commission ("PUC") and is sued in her official capacity for declaratory and injunctive relief.  (Compl. ¶ 10.)  Defendants Lange, Lipschultz, Tuma, and Wergin are Commissioners of the PUC and are sued in their official capacities for declaratory and injunctive relief.  (Compl. ¶¶ 11-14.)

---

[1]  Defendants also originally moved to dismiss for lack of subject matter jurisdiction but clarified at oral argument that was an error.

Charter Advanced alleges that the PUC exceeded its authority by attempting to impose Minnesota statutory and regulatory requirements governing traditional telephone services on Charter Advanced's interconnected VoIP service.[2]  (Compl. ¶ 3.) On September 24, 2015, the PUC issued an order ("PUC Order") that Plaintiffs allege will cause the State of Minnesota to regulate Charter Advanced's VoIP service as though it were a traditional telephone service.  (Compl. ¶ 4.)  According to Charter Advanced, the PUC order singles out Charter Advanced's VoIP service as the only such service in Minnesota subject to such regulation, leaving other similar providers unregulated. (Compl. ¶ 5.)  Charter Advanced contends the PUC's actions are preempted by the Telecommunications Act of 1996 ("Telecommunications Act") and violate the Supremacy Clause of the United States Constitution.  (Compl. ¶ 6.)  State regulation is preempted, Charter Advanced posits, because Charter Advanced's VoIP service is an "information service" under the Telecommunications Act, not a "telecommunications service," and States such as Minnesota are precluded from imposing rules governing traditional telephone providers on information service providers.  (Compl. ¶ 7.)

## A.    Charter Advanced's VoIP Service

Charter Advanced alleges in its complaint that its VoIP service differs from a traditional telephone service in several ways.  The service is provided through a broadband Internet-capable cable connected to the subscriber's home.  (Compl. ¶ 19.)

---

[2]  Charter Advanced's interconnected VoIP service is currently marketed as "Spectrum Voice."  Charter Advanced uses this term throughout its opposition memorandum, but not in its complaint.  Defendants use the term "Charter Phone" for Charter Advanced's VoIP service.  In this Report and Recommendation, this Court will use the term "VoIP service" to refer to Charter Advanced's interconnected VoIP service.

The subscriber uses special equipment installed in the home, a multimedia terminal adapter ("MTA"), to access the service.  (Compl. ¶ 19.)  The MTA formats the user's voice into analog electric signals into Internet Protocol ("IP") data packets, which are routed through the cable to Charter's IP network.  (Compl. ¶ 19.)  The IP data packets are formatted the same as other data packets on the Internet.  (Compl. ¶ 19.)

Traditional telephone networks, by contrast, use a public switched telephone network ("PSTN"), not an IP network.  (Compl. ¶ 20.)  PSTN networks transmit voice information through a technology known as "'circuit switching,' in which a dedicated pathway is established for the duration of a phone call."  (Compl. ¶ 20.)  To route multiple calls over the same PSTN, traditional carriers use a technique known as Time Division Muliplexing ("TDM").  (Compl. ¶ 20.)

Charter Advanced's VoIP service allows users to communicate not only with other VoIP users but also with users of traditional telecommunications carriers through "interconnected" VoIP service.  (Compl. ¶ 21.)  To accomplish this interconnected service, the VoIP network must be connected to a traditional carrier's network, and the calls are converted from IP to TDM, and vice versa.  (Compl. ¶ 21.)  The process of converting information between the different formats is commonly referred to as "protocol conversion."  (Compl. ¶ 21.)

In addition to providing voice communication services over broadband cable and Internet facilities, Charter Advanced has the capability to offer features such as an online web portal that integrates voice calling features with an email account, features associated with Charter's Internet and cable video offerings, access to voicemail as audio

or text files, and caller ID information displayed on the subscriber's television screen. (Compl. ¶ 22.)

Before March 2013, Charter offered VoIP services in Minnesota through two affiliates, Charter Fiberlink CCO, LLC and Charter Fiberlink CC VIII, LLC (collectively "Charter Fiberlink").  (Compl. ¶ 26.)  In March 2013, Charter Fiberlink assigned its retail voice customers to Charter Advanced.  (Compl. ¶ 27.)  The purpose was twofold:  (1) "to simplify its operations," and (2) "to avail itself of the more clear delineation between the regulated services offered by Charter Fiberlink (which include wholesale interconnection services, data wide area network and private line services to business customers, and local origination and termination services to other carriers) and its retail interconnected VoIP services."  (Compl. ¶ 27.)  Charter Fiberlink notified its subscribers in writing of the change a month ahead of time and advised them they could accept the revised terms by continuing their service.  (Compl. ¶ 27.)

The Minnesota Department of Commerce ("DOC") filed a complaint on September 26, 2014, alleging that the transfer of customers violated Minnesota's anti-slamming statutes[3] and requesting that Charter Advanced's VoIP service be governed by Minnesota statutes governing telecommunications providers.  (Compl. ¶ 28.)  Charter, Charter Advanced, and Charter Fiberlink answered and distinguished their services as information services governed by federal law, not telecommunications services subject to state regulation.  (Compl. ¶ 29.)  The PUC issued an order on July 28, 2015, finding that

---

[3] Unilaterally changing a customer's telephone provider to another provider without notice to and authorization from the customer is known as "slamming."  *See* Minn. Stat. § 237.661.

Charter Advanced's VoIP services are telecommunications services subject to state regulation.  (Compl. ¶ 29.)  Charter Advanced contends this determination was contrary to numerous federal court decisions holding that interconnected VoIP is an information service governed by federal law.  (Compl. ¶ 29.)  The PUC ordered Charter to submit within thirty days a proposed plan for compliance with applicable Minnesota rules and regulations.  (Compl. ¶ 29.)  The PUC did not take any position on Charter's past services or the customer transfer from Charter Fiberlink to Charter Advanced.  (Compl. ¶ 29.)  After denying a motion for rehearing, the PUC issued its final order on September 24, 2015 ("PUC Order").  (Compl. ¶ 29.)

Charter Advanced contends it will be harmed by conforming its operations to Minnesota's rules for telecommunications carriers in Minnesota.  (Compl. ¶ 30.)  Namely, Charter Advanced would have to implement unique processes for Minnesota, offer services not warranted by local market conditions, offer voice service separately without an Internet connection, and undergo a certification process to become a regulated Minnesota carrier.  (Compl. ¶ 30.)

### B.    Charter Advanced's Claims

Based on the above facts, Charter Advanced brings two claims:  (1) Count 1 is captioned "Action in Equity to Prevent Illegal State Action in Violation of the Supremacy Clause"; and (2) Count 2 is captioned "Action under 42 U.S.C. § 1983."  With respect to Count 1, Charter Advanced claims that federal law preempts states from imposing statutory or regulatory public utility or common carrier requirements on interstate information services.  (Compl. ¶ 35.)  Charter Advanced alleges that the State of

Minnesota's regulation of its VoIP service violates the Telecommunications Act and the Supremacy Clause.  (Compl. ¶ 36.)  As relief, Charter Advanced asks the Court to enjoin Defendants' actions and declare that application of Minnesota's telecommunications regulations to Charter Advanced violates the Telecommunications Act and the Supremacy Clause.  (Compl. ¶ 38.)  With respect to Count 2, Charter Advanced alleges that Defendants acted under color of state law in issuing the MPUC Order.  (Compl. ¶ 42.)  Charter Advanced asks for the same injunctive and declaratory relief for Count 2 as it does for Count 1.

## II.    Legal Standards

### A.    Rule 12(b)(6) Motion to Dismiss

Dismissal is warranted under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The plaintiff must plead facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Labels, bare conclusions, and formulaic recitations of the elements are not enough. *Id.*  In applying the Rule 12(b)(6) standard, a court accepts all alleged facts as true and affords the plaintiff all

reasonable inferences arising from the allegations. *Butler v. Bank of Am., N.A.*, 690 F.3d 959, 961 (8th Cir. 2012).

Generally, a court may not consider matters outside the pleadings in assessing the sufficiency of a complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted). A court may make an exception to this rule, however, for matters of public record, exhibits attached to the complaint, and other materials "necessarily embraced by the pleadings." *See id.* (citations omitted).

### B. The Supremacy Clause and Preemption

"When the Federal Government acts within the authority it possesses under the Constitution, it is empowered to pre-empt state laws to the extent it is believed that such action is necessary to achieve its purposes." *City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988). The Supremacy Clause gives force to this federal action. *Id.* (citing U.S. Const. art. VI, cl. 2).

State action may be preempted in the following circumstances: (1) "when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law"; (2) "when there is outright or actual conflict between federal and state law"; (3) "where compliance with both federal and state law is in effect physically impossible;" (4) "where there is implicit in federal law a barrier to state regulation;" (5) "where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law"; (6) "where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress"; or (7) when a federal agency, such as the Federal Communications Commission ("FCC"),

preempts state regulation pursuant to its congressionally-delegated powers. *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368-69 (1986) (citations omitted).

In enacting the Telecommunications Act, Congress "unquestionably" took "the regulation of local telecommunications competition away from the States" with respect to matters covered by the Act. *AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 378 n.6 (1999). Relevant here, Congress has expressed its clear intent to preempt state regulation of information services, and there is an alleged conflict between Minnesota regulations and federal law. *See Vonage Holdings Corp. v. Minn. Pub. Util. Comm'n*, 290 F. Supp. 2d 993, 1001-02 (D. Minn. 2003). The FCC has preempted state regulation of VoIP service when interstate and intrastate components of communications could not be separated, *Minnesota Public Utilities Commission v. F.C.C.*, 483 F.3d 570, 577-78, 580-81 (8th Cir. 2007); *In re Vonage Holdings Corp.* 19 F.C.C. Rcd. 22404, 22404 ¶ 1 (2004); and state regulation of "nomadic interconnected VoIP service [that] cannot be separated into interstate and intrastate components," *Vonage Holdings Corp. v. Nebraska Public Service Commission*, 564 F.3d 900, 905 & 906 n.5 (8th Cir. 2009).

## III.   Discussion

As the basis for dismissal of Charter Advanced's claims, Defendants argue that Charter Advanced's VoIP service is a telecommunications service, and thus subject to state regulation. Defendants offer several bases for their argument. First, Defendants submit that Charter Advanced offers a "fixed" VoIP service, as compared to a "nomadic"

VoIP service.[4]  Second, Defendants contend that Charter Advanced's VoIP service has the functionality of a telecommunications service and its customers regard it as offering such a service.  Third, Defendants argue Charter Advanced's VoIP service falls within the telecommunications systems management exception of the definition of "information services" under the Telecommunications Act.  Fourth, Defendants submit that public policy supports state regulation.  Fifth, Defendants contend that the impossibility exception to the classification of a service as a telecommunications service does not apply here.  Sixth, Defendants maintain that Charter Advanced's VoIP service is a telecommunications service because it is offered to the public for a fee.  Lastly, Defendants argue that Charter Advanced's VoIP service is substantially similar to services the FCC found to be telecommunications services.  Defendants concede the disposition of Charter Advanced's second claim is contingent on the disposition of the first claim.

In response to Defendants' arguments, Charter Advanced denies that whether a VoIP service is fixed or nomadic is determinative of whether the service is an information service or a telecommunications service.  Charter Advanced further maintains that its VoIP service is an information service because the service involves net protocol conversions and the calling features are inextricably intertwined with other data-processing capabilities.  Charter Advanced also makes several arguments why the telecommunications systems management exception does not apply and counters Defendants' policy-based argument.

---

[4]  These terms are explained in Part III.A.2 *infra*.

The question for the Court on this motion to dismiss, as framed by the parties, is easily phrased, but not easily answered:  Is Charter Advanced's fixed, interconnected VoIP service an information service or a telecommunications service under the Telecommunications Act?  The FCC and courts across the country have asked the same question about other VoIP services, but more than ten years after the question was first raised before the FCC, it has yet to provide a definitive answer.  Moreover, the question is not a pure issue of law, as Defendants submit.  As discussed fully below, the particular components and functionality of a VoIP service are material to the definitions.  To lay the groundwork in this case, the Court will begin with the relevant statutory language, then turn to the case law and administrative decisions that have addressed related issues to determine whether they dispose of the claims pleaded in Charter Advanced's complaint in such a way as to warrant dismissal of those claims at this stage of the case.

## A.   Overview of Relevant Authority

### 1.   The Telecommunications Act

The FCC has exclusive jurisdiction to regulate "interstate and foreign commerce in communication by wire and radio."  47 U.S.C. § 151.  Excepted from the FCC's jurisdiction are "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier."  *Id.* § 152(b).  Thus, the Telecommunications Act establishes "a system of dual state and federal regulation" over wire and radio communications.  *See La. Pub. Serv. Comm'n*, 476 U.S. at 360 (interpreting the Communications Act of 1934, which is the predecessor of the Telecommunications Act).  As the Supreme Court said in interpreting the

11

Communications Act of 1934:

> [W]hile the Act would seem to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction—in practice, the realities of technology and economics belie such a clean parceling of responsibility.

*Id.*

The Telecommunications Act defines an information service as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, . . . but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24).  The Telecommunications Act defines a telecommunications service as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  *Id.* § 153(53).  The term "telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(50).  An information service is subject solely to the FCC's jurisdiction, while a telecommunications service is subject to state regulation.  *See Vonage Holdings Corp.*, 290 F. Supp. 2d at 994; *In re IP-Enabled Servs.*, Notice of Proposed Rulemaking, 19 F.C.C. Rcd. 4863, 4880-81 ¶¶ 25-27 (2004).

The FCC has defined by regulation interconnected VoIP service as a service that:

> (1) Enables real-time, two-way voice communications; (2) Requires a broadband connection from the user's location; (3) Requires Internet protocol-compatible customer premises equipment (CPE); and (4) Permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network.

47 C.F.R. § 9.3 (2009).  Interconnected VoIP service is a "VoIP-to-landline or landline-to-VoIP communication[]," in which "the geographic location of the landline part of the call can be determined, but the geographic location of the VoIP part of the call could be anywhere in the universe the VoIP customer obtains broadband access to the Internet." *Minn. Pub. Util. Comm'n v. F.C.C.*, 483 F.3d 570, 574-75 (8th Cir. 2007).  When the FCC has interpreted a provision of the Telecommunications Act, the Court "must defer to the FCC's view so long as it is a reasonable interpretation of an ambiguous statute." *Sw. Bell Tel. Co. v. Connect Commc'ns Corp.*, 225 F.3d 942, 946 (8th Cir. 2000) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).

## 2.    The *Vonage* Line of Authority

In *Vonage Holdings Corp. v. Minnesota Public Utilities Commission*, Vonage, a telecommunications company, sought to enjoin the enforcement of a PUC order requiring it to comply with Minnesota regulations.  290 F. Supp. 2d 993, 994 (D. Minn. 2003) ("*Vonage I*").  Vonage argued that its VoIP service, which permitted customers to place and receive voice communications over a broadband Internet connection, was an information service and thus immune from state regulation.  *Id.* at 994-95.  "[P]lain old telephone service" ("POTS"), by contrast, connected a person using a traditional telephone to the PSTN operated by local telephone companies.  *Id.* at 995.  VoIP

13

telephony did not use circuit switching technology, as POTS did, but utilized packet switching, a process through which data is broken down and transmitted over the Internet. *Id.* at 995. A Vonage customer could, however, make calls from a computer to a telephone and receive calls from a telephone to a computer. *Id.* To accomplish this, the customer had to install special equipment. *Id.* The customer's phone number was not associated with the customer's physical location, but with the location of the customer's computer. *Id.* The customer could make and receive phone calls anywhere broadband access was available, and Vonage was not able to determine the geographic location of customers using its service. *Id.*

The issue in *Vonage I* was whether Vonage was subject to a state regulation that required telephone companies to obtain certification to provide telephone service. *Id.* at 996. The court noted at the outset of the discussion that "the backbone of Vonage's service is the Internet." *Id.* at 997. The transmission of calls to or from a POTS required Vonage to convert the format of calls, which caused Vonage's service to fit within the definition of an information service. *Id.* at 999. Although Vonage's VoIP service was "closely tied to the provision of telecommunications services as defined by Congress, the courts[,] and the FCC, . . . this Court finds that Vonage *uses* telecommunications services, rather than provides them." *Id.* (emphasis in original). In addition, "[b]ecause Vonage never provides phone-to-phone IP telephony (it only provides computer-to-phone or phone-to-computer IP telephony), from a 'functional standpoint,' Vonage's service is distinguishable from" telecommunications services. *Id.* at 1000-01. The court rejected the PUC's "quacks like a duck" argument: that because Vonage's customers made phone

calls, it necessarily provided a telecommunications service.  *Id.* at 1001.

Vonage I concluded that Vonage's VoIP service was an information service, as the

term is defined by § 153(24).  *Id.* at 999.  Because the PUC's attempted regulation of

Vonage conflicted with Congress's intent for the FCC to have exclusive jurisdiction to

regulate information services, and with federal policy supporting a complete distinction

between information services and telecommunications services, the PUC's order was

preempted.  *Id.* at 1002.  The court ultimately granted a permanent injunction preventing

enforcement of the PUC order.  *Id.* at 1004.

A year after *Vonage I* was decided, the FCC preempted the same PUC order

applying state regulations to Vonage's VoIP service, but on different grounds.  *In re*

*Vonage Holdings Corp.*, 19 F.C.C. Rcd. 22404 (2004) ("*Vonage II*").  The FCC set forth

the following relevant facts.  Unlike traditional circuit-switched telephone service,

Vonage's VoIP service required access to a broadband Internet connection, which

Vonage itself did not provide, and the service was "fully portable," meaning its

customers could use it anywhere in the world.  *Id.* at 22406 ¶ 5.  Because Vonage did not

provide the Internet service, it had no way to track its users' location.  *Id.*  In addition,

customers had to use a CPE, such as an MTA or IP phone, to complete the necessary

audio-to-digital or digital-to-audio conversion.  *Id.* at 22407 ¶ 6.  Finally, Vonage offered

not only voice functionality but also voicemail and online account management.  *Id.* at

22407 ¶ 7.

The FCC preempted the PUC order on grounds of impossibility: because the VoIP

service could not be separated into interstate and intrastate communications, state

15

regulation was preempted.  *Id.* at 22404 ¶ 1.  The FCC, not the States, "has the responsibility and obligation to decide whether certain regulations apply to" IP-enabled services.  *Id.* at 22405 ¶ 1.  "Where separating a service into interstate and intrastate communications is impossible or impractical, the Supreme Court has recognized the Commission's authority to preempt state regulation that would thwart or impede the lawful exercise of federal authority over the interstate component of the communications."  *Id.* at 22414 ¶ 19.  Even if it were possible to separate the intrastate and interstate components, Vonage's service was too multifaceted, and tracking and recording geographic information would be too complex.  *Id.* at 22419 ¶ 23.

The FCC did not discuss or determine in *Vonage II* whether Vonage was an information services provider or a telecommunications services provider, but rested its decision solely on the impossibility exception.  *See id.* at 22411 n.46 (noting the statutory classification was presently the subject of a separate proceeding, *In re IP-Enabled Services*).  The FCC forecast, however, that "the practical inseverability of other types of IP-enabled services having basic characteristics similar to DigitalVoice would likewise preclude state regulation to the same extent as described herein."  *Id.* at 22424 ¶ 32.  Such basic characteristics included a required broadband connection, CPE, and features that allow "customers to manage personal communications dynamically, including enabling them to originate and receive voice communications and access other features and capabilities, even video."  *Id.*

To the extent other entities, even cable companies, "provide VoIP services, we would preempt state regulation to an extent comparable to what we have done in this

Order."  *Id.* at 22432 ¶ 32; *see also id.* at 22404 ¶ 1 ("[T]o the extent that other VoIP

services are not the same as Vonage's but share similar basic characteristics, we believe it

highly unlikely that the Commission would fail to preempt state regulation of those

services to the same extent.").

     *Vonage II* was affirmed by the Eighth Circuit Court of Appeals in *Minnesota*

*Public Utilities Commission v. F.C.C.*, 483 F.3d 570 (8th Cir. 2007) ("*Vonage III*").

The *Vonage III* court also explained the distinction between VoIP communications,

which utilize packet-switching technology over the Internet, and traditional telephone

communications, which use circuit-switched applications.  *Id.* at 574.  The court

acknowledged that "[t]he end-to-end geographic locations of traditional landline-to-

landline telephone communications are readily known, so it is easy to determine whether

a particular phone call is intrastate or interstate in nature," whereas VoIP-to-VoIP

communications are not tied to any identifiable geographic location.  *Id.*  Similarly, with

VoIP-to-landline or landline-to-VoIP communications, the landline part of the call can be

geographically identified, but the VoIP part of the call could be anywhere.  *Id.* at 574-75.

     *Vonage III* also described the difference between "fixed" and "nomadic" VoIP

service:

> Nomadic service is the type described above, where a VoIP customer can
> use the service "nomadically" by connecting with a broadband internet
> connection anywhere in the universe to place a call.  Fixed VoIP service
> describes the use of the same technology, that is, converting a voice
> communication into digital packets before transmitting it to another
> location, but in a way where the service is used from a fixed location.

*Id.* at 575.  Consequently, "when VoIP is offered as a fixed service rather than a nomadic

service, the interstate and intrastate portions of the service can be more easily distinguished." *Id.* But *Vonage III* also found the FCC properly considered "the economic burden of identifying the geographic endpoints of VoIP communications in determining whether it was impractical or impossible to separate the service into its interstate and intrastate components." *Id.* at 578. "[W]hether VoIP services can be separated into interstate and intrastate components is a largely fact-driven inquiry requiring a high level of technical expertise." *Id.* at 579. Moreover, service providers are not obligated to develop a method to track interstate and intrastate communications in order to aid state commissions in regulating them. *Id.*

The court observed that preemption of state regulation of fixed VoIP services remained "an open issue," but noted the FCC's prediction that, "if faced with the precise issue, [it] would preempt [state regulation of] fixed VoIP services." *Id.* at 582-83.

### 3. Overview of FCC Decisions, Reports, and Notices

#### a. *Universal Service Report*

In 1998, the FCC issued a Report to Congress titled *In re Federal-State Joint Board on Universal Service*, 13 F.C.C. Rcd. 11501 (1998) ("*Universal Service Report*"). By way of introduction, the FCC noted that "telecommunications is an industry characterized by extremely rapid changes, as technological advances lead to the introduction of revolutionary services . . . . We can only speculate about the technologies and services that will be offered in the future." *Id.* ¶ 2. With that qualification, the FCC endeavored to interpret the statutory terms "telecommunications," "telecommunications service," and "information service," while recognizing that proper interpretation of those

terms "raises difficult issues that are the subject of heated debate." *Id.* ¶ 33.

The FCC reiterated a prior finding that telecommunications services and information services were "mutually exclusive." *Id.* ¶ 39.  With that precept in mind, the FCC found that "an entity offering a simple, transparent transmission path, without the capability of providing enhanced functionality, offers 'telecommunications.'" *Id.*  On the other hand, "when an entity offers transmission incorporating the '*capability* for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information,' . . ., it offers an 'information service' even though it uses telecommunications to do so." *Id.*  The purpose of the statutory definition of "transmission"—"without change in the form or content of the information as sent and received"—was "to ensure that an entity is not deemed to be providing 'telecommunications,' notwithstanding its transmission of user information, in cases in which the entity is altering the form or content of that information." *Id.* ¶ 40.  An entity provides "telecommunications" only when it "provides a transparent transmission path, and does not 'change . . . the form and content' of the information." *Id.* ¶ 41.

The FCC explicitly declined to decide whether transmission services involving protocol processing were information services or telecommunications services. *Id.* ¶¶ 49-52.  It suggested, however, that protocol processing occurring "incident to phone-to-phone IP telephony does not affect the service's classification" as a telecommunications service "because it results in no net protocol conversion to the end user." *Id.* ¶ 52.

The FCC then turned to a discussion of "hybrid services," where "a provider offers a capability for generating, acquiring, storing, transforming, processing, retrieving,

utilizing or making available information via telecommunications, *and* as an inseparable

part of that service transmits information supplied or requested by the user." *Id.* ¶ 56

(emphasis in original).  The FCC adopted a "functional approach" to determine when a

hybrid service is an information service or a telecommunications service.  *Id.* ¶¶ 58-59.

The functional approach is "consistent with Congress's direction that the classification of

a provider should not depend on the type of facilities used."  *Id.* ¶ 59.

> A telecommunications service is a telecommunications service regardless of
> whether it is provided using wireline, wireless, cable, satellite, or some other
> infrastructure.  Its classification depends rather on the nature of the service
> being offered to customers.  Stated another way, if the user can receive
> nothing more than pure transmission, the service is a telecommunications
> service.  If the user can receive enhanced functionality, such as manipulation
> of information and interaction with stored data, the service is an information
> service.

*Id.*  "The issue is whether, functionally, the consumer is receiving two separate and

distinct services."  *Id.* ¶ 60 (quotation omitted).  In the context of an information service,

"a single service from the end user's standpoint is not subject to carrier regulation simply

by virtue of the fact that it involves telecommunications components."  *Id.* ¶ 58.

The FCC next discussed IP telephony and indicated that some IP telephony could

fall within the statutory definition of "telecommunications."  *Id.* ¶ 83.  The FCC observed

that "certain 'phone-to-phone IP telephony' services lack the characteristics that would

render them "information services" within the meaning of the statute, and instead bear the

characteristics of 'telecommunications services.'"  *Id.*  But the FCC qualified this

observation by stating it would not be "appropriate to make any definitive

pronouncements in the absence of a more complete record focused on individual service

offerings." *Id.*  Applying the functional approach to IP telephony, the FCC suggested

that providing "computer-to-computer" telephone service would not fall within the

definition of "telecommunications services." *Id.* ¶ 87.

On the other hand, providing "phone-to-phone" IP telephony may constitute a

telecommunications service when:

> (1) [the provider] holds itself out as providing voice telephony or facsimile
> transmission service; (2) [the provider] does not require the customer to use
> CPE different from that CPE necessary to place an ordinary touch-tone call
> (or facsimile transmission) over the public switched telephone network;
> (3) [the provider] allows the customer to call telephone numbers assigned in
> accordance with the North American Numbering Plan, and associated
> international agreements; and (4) [the provider] transmits customer
> information without net change in form or content.

*Id.* ¶ 88.  As an example, the FCC described a situation in which an IP telephony provider

would use a gateway to facilitate phone-to-phone service, but would not offer

information services such as access to stored files or the capability to generate, acquire,

store, transform, process, retrieve, or utilize information.  *Id.* ¶ 89.  In that situation, the

IP telephony would lack the characteristics of an information service.  *Id.*  But the FCC

quickly clarified that it was making no "definitive pronouncements" and that it would

await "a more complete record focused on individual service offerings."  *Id.* ¶ 90 ("We

defer a more definitive resolution of these issues pending the development of a more

fully-developed record because we recognize the need, when dealing with emerging

services and technologies in environments as dynamic as today's Internet and

telecommunications markets, to have as complete information and input as possible.").

###### b.     *IP-Enabled Services Notice*

On March 10, 2004, the FCC released a Notice of Proposed Rulemaking in *In re IP-Enabled Services*, 19 F.C.C. Rcd. 4863 (2004) ("*IP-Enabled Services Notice*"), seeking "comment on the impact that IP-enabled services, many of which are accessed over the Internet, have had and will continue to have on the United States' communications landscape." *Id.* at 4864 ¶ 1.  The FCC described how it understood the difference between circuit-switched networks and IP networks:

> Whereas circuit-switched networks generally reserve dedicated resources along a path through the network, IP networks route traffic without requiring the establishment of an end-to-end path.  A telephone call placed over a circuit-switched network typically requires resources to be reserved along the path between both parties for the entire duration of the call, even if the amount of information being transferred does not require the full bandwidth of the facilities.  In contrast, in Internet Protocol networking, data is segmented into packets which are individually addressed and then transmitted over a series of physical networks which may be comprised of copper, fiber, coaxial cable, or wireless facilities.  When packets are transmitted via IP between two points, the network does not establish a permanent or exclusive path between the points.  Instead, routers read packet addresses individually, and decide - sometimes on a packet-by-packet basis - which route to use for each packet.  Thus, the routes that packets will take to the same destination may vary, depending on the best routing information available to the routers.  Indeed, packets traveling in the opposite direction on the return communications between the same sending and receiving pair may follow an entirely different path.  Moreover, these packets may carry any type of information for applications offering widely disparate functions, including those facilitating voice communications.

*Id.* at 4869-70 ¶ 8.

In a subsequent order in the same proceeding, the FCC declined to decide whether interconnected VoIP services are information services or telecommunications services. *In re Implementation of the Telecommunications Act of 1996: Telecommunications*

*Carriers' Use of Customer Proprietary Network Information & Other Customer*

*Information*, 22 F.C.C. Rcd. 6927, 6955 ¶ 54 (2007).

> **c.      *AT&T Order***

In 2004, the FCC determined that the provision of a transmission with no net

change in the form or content of information sent or received was a telecommunications

service. *In re Pet. Decl. Ruling AT&T's Phone-to-Phone IP Telephony Servs. Are*

*Exempt from Access Charges*, 19 F.C.C. Rcd. 7457, 7465 ¶ 12 (2004) ("*AT&T Order*").

The FCC limited its decision, however, to interchange services that:  "(1) use[] ordinary

customer premises equipment (CPE) with no enhanced functionality; (2) originate[] and

terminate[] on the public switched telephone network (PSTN); and (3) undergo[] no net

protocol conversion and provide[] no enhanced functionality to end users due to the

provider's use of IP technology." *Id.* ¶ 1.

The FCC reasoned that AT&T's internal decision to route phone calls through "its

Internet backbone" did not transform the nature of its service from a telecommunication

service to an information service. *Id.* at 7465 ¶ 12.  Users of AT&T's service "obtain[ed]

only voice transmission with no net protocol conversion, rather than information services

such as access to stored files." *Id.*  Nor did AT&T offer the capability to generate,

acquire, store, transform, process, retrieve, utilize, or make available information. *Id.*

The FCC envisioned a time when VoIP services such as AT&T's could "evolve into

integrated voice, data and enhanced services platforms," but declined to decide such a

service would meet the definition of an information service. *Id.* at 7465 ¶ 13.

### d.     *USF Order*

By 2006, the number of VoIP subscribers had increased significantly, a trend the

FCC recognized would continue.  *In re Universal Serv. Contrib'n Methodology*,

21 F.C.C. Rcd. 7518, 7536 ¶ 34 (2006) ("*USF Order*"), *aff'd in relevant part sub nom.*

*Vonage Holdings Corp. v. F.C.C.*, 489 F.3d 1232 (D.C. Cir. 2007).  The FCC

acknowledged it had "not yet classified interconnected VoIP services as

'telecommunications services' or 'information services' under the definitions of the Act."

*Id.* at 7537 ¶ 35.  And, it again declined to do so.  *Id.*  ("Again here, we do not classify

these services.").  Instead, the FCC exercised its permissive authority under 47 U.S.C.

§ 254(d), a separate statute governing universal service requirements, and its ancillary

jurisdiction under Title I of the Telecommunications Act, to require all interconnected

VoIP providers to contribute to the federal universal service fund.  *Id.*  The FCC based its

decision on findings that "interconnected VoIP providers are 'providers of interstate

communications' as required for the use of permissive authority pursuant to section

254(d)," *id.* at 7538 ¶ 39; that interconnected VoIP providers actually "provide"

telecommunications, as that term is defined by § 254, by furnishing the transmission

component of telecommunications, *id.* at 7538-39 ¶ 40; that interconnected VoIP

providers provide telecommunications through the transmission of calls utilizing, at some

point during the transmission, the PSTN, *id.* at 7539 ¶ 41; and that because some part of

"jurisdictionally mixed" services is interstate in nature, such services should be subject to

contributions on interstate revenues, *id.* at 7540 ¶ 42.  "For these reasons, we conclude

that interconnected VoIP providers are 'providers of interstate telecommunications'

under section 254(d)." *Id.* Finally, the FCC found that requiring interconnected VoIP providers to contribute to the universal service fund was in the public interest. *Id.* at 7540 ¶ 43.

To calculate the amount of contributions owed to the universal service fund, the FCC allowed interconnected VoIP providers to report their actual revenue for interstate telecommunications, use a safe harbor percentage, or rely on traffic studies. *See id.* at 7546 ¶ 56. The FCC warned, however, "that an interconnected VoIP provider with the capability to track the jurisdictional confines of customer calls would no longer qualify for the preemptive effects of our *Vonage* Order and would be subject to state regulation." *Id.* at 7546 ¶ 56 ("Indeed, a fundamental premise of our decision to preempt Minnesota's regulations in [*Vonage II*] was that it was impossible to determine whether calls by Vonage's customers stay within or cross state boundaries.").

The VoIP providers sought review of the FCC's contribution requirement, *see Vonage Holdings Corp. v. F.C.C.*, 489 F.3d 1232 (D.C. Cir. 2007) ("*Vonage IV*"), and the FCC's decision was affirmed in relevant part. The court found "significant[] for VoIP's future" that the FCC undertake an effort to "classify VoIP as a 'telecommunications service' or an 'information service.' If classified as a telecommunications service, VoIP would be subject to mandatory Title II common carrier regulations, . . . but as an information service it would not." *Id.* at 1235. In response to the VoIP providers' argument that interconnected VoIP would always involve a change in the form or content of information, and thus by definition could not be telecommunications, the court remarked it had "found no indication that anyone made

25

this argument before the Commission, which may explain why the Commission never addressed it." *Id.*

### e. *Open Internet Order*

Last year, the FCC determined that broadband Internet access is a telecommunications service. *In re Protecting & Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5763 ¶ 363 (2015) ("*Open Internet Order*"). The FCC "observe[d] that the critical distinction between a telecommunications and an information service turns on what the provider is 'offering." *Id.* at 5756 ¶ 355. Broadband Internet access service, as offered by both fixed and nomadic providers, includes two separate components: (1) high-speed access to the Internet and (2) other functions and applications. *Id.* at 5757 ¶ 356. Broadband Internet service is sufficiently independent from information services like email and online storage such that it constitutes a separate offering. *Id.* at 5757-58 ¶ 356. Functions like the domain name system, caching of content, and certain network security functions—when provided with broadband Internet access—"fit squarely within the telecommunications systems management exception to the definition of 'information service,'" even though those capabilities would otherwise be classified as "information services." *Id.* at 5858 ¶ 356, 5765-66 ¶¶ 365-66, 5770-71 ¶ 372, 5771 ¶ 373. The FCC correspondingly determined that broadband Internet access service is not an information service under the Telecommunications Act. *Id.* at 5765 ¶ 365.

With specific respect to VoIP service, the FCC recognized that some data services like "facilities-based VoIP offerings . . . may be offered by a broadband provider but do not provide access to the Internet generally." *Id.* at 5611 ¶ 35. Such "IP-services that do

not travel over broadband Internet access service, like the facilities-based VoIP services used by many cable customers, are not within the scope of the open Internet rules, which protect access or use of broadband Internet access service." *Id.* at 5611 ¶ 35.

### 4.    Other Relevant Case Authority

In *Southwestern Bell Telephone, L.P. v. Missouri Public Service Commission*, the court concluded that an IP to PSTN transmission was an information service because it offered the capability to generate, acquire, store, transform, process retrieve, utilize, or making available information through telecommunications.  461 F. Supp. 2d 1055, 1082 (E.D. Mo. 2006), *aff'd*, 530 F.3d 676 (8th Cir. 2008).  Such a transmission alters the form and content of the information sent or received because the data packets of the originating IP protocol are converted to a TDM format.  *Id.*

In *PAETEC Communications, Inc. v. CommPartners, LLC*, the dispute concerned whether VoIP-originated calls could be subject to a tariff.  No. Civ.A.08-0397(JR), 2010 WL 1767193, at *1 (D.D.C. Feb. 18, 2010).  CommPartners argued, as Charter Advanced argues here, that VoIP to TDM conversion was an information service.  *Id.* at *2. The court noted the terms "information service" and "telecommunications service" were mutually exclusive, and that services combining telecommunications and information functions should be treated as information services.  *Id.*  The court took a dim view of the FCC's awareness of the issue and failure to resolve it.  *See id.* at *3 & n.3.  Relying on *Vonage I* and *Southwestern Bell*, the court concluded that transmissions involving net protocol conversion from VoIP to TDM were information services.  *Id.* at *3.

The most recent relevant case law is *Sprint Communications Co. v. Bernsten*,

No. 11-CV-183-JAJ, 2015 WL 9914589, at *2 (S.D. Iowa Dec. 30, 2015). The court recognized that when intrastate and interstate components of a communication cannot be disentangled, the FCC can preempt state regulation under the impossibility exception. No. 11-CV-183-JAJ, 2015 WL 9914589, at *2 (S.D. Iowa Dec. 30, 2015). The distinction between fixed and nomadic VoIP services was described as: "Nomadic VoIP services can be used anywhere 'in the universe' the user can get an Internet connection . . . . Fixed VoIP services require equipment installed at a specific location, like a cable connection, to work." *Id.* (citing *Vonage III*, 483 F.3d at 575). The court observed that the FCC's application of the impossibility exception in *Vonage II* was based on a finding that the VoIP service was nomadic. *Id.* at *6. Because the calls in *Sprint* were fixed—"users could call Iowa locations from other Iowa locations," and Sprint could track the locations of calls—*Vonage II*'s reasoning did not apply and Sprint's VoIP service was subject to state regulation. *Id.* (citations omitted). The court explicitly declined to decide whether VoIP is an information service, however. *Id.* Rather, the decision was grounded in 47 U.S.C. § 251, which requires telecommunications carriers to interconnect with other such carriers and expressly grants States the right to enforce regulations and orders establishing access and interconnection obligations of local carriers. *Id.*; *see* 47 U.S.C. § 251(a)(1), (d)(3), (g).

### B.    Issues Raised in Defendants' Motion to Dismiss

#### 1.    Whether the *USF Order* Established Interconnected VoIP Service as a Telecommunications Service

Defendants argue the *USF Order* is dispositive of the issue before this Court

because, they claim, the FCC determined in that order that interconnected VoIP is a telecommunications service and therefore subject to state regulation.

The Court disagrees for two reasons.  First, the FCC explicitly declined to classify interconnected VoIP as a telecommunications service or an information service.  *USF Order,* 21 F.C.C. Rcd. at 7537 ¶ 35.  Second, the *USF Order* concerned the universal service fund contribution requirements of 47 U.S.C. § 254 and is not directly applicable here.  Section 254 directed the FCC "to establish universal service support mechanisms with the goal of ensuring the delivery of affordable telecommunications services to all Americans."  *Id.* at 7521 ¶ 5.  In the *USF Order*, the FCC exercised its permissive authority under § 254 and its ancillary jurisdiction to require interconnected VoIP providers to contribute to the federal universal service fund.  The relevant section of § 254 requires "[e]very telecommunications carrier that provides interstate telecommunications services [to] contribute" to the universal service fund.  § 254(d).  In addition, under § 254, the FCC may require "[a]ny other provider of interstate telecommunications . . . to contribute to the preservation and advancement of universal service if the public interest so requires."  *Id.*  Because both telecommunications services and information services are provided "via telecommunications," 47 U.S.C. § 153(24); *see* § 153(53), the FCC was authorized by § 254 to require interconnected VoIP providers—as providers of telecommunications—to contribute to the fund, regardless of whether VoIP was a telecommunications service.

Defendants assign great weight to the FCC's finding that interconnected VoIP providers provide telecommunications.  But it is not unusual for an information service to

include a telecommunications component, and this does not transform the information service into a telecommunications service. *See Vonage IV*, 489 F.3d 1232, 1241 (D.C. Cir. 2007) ("Indeed, the Act clearly contemplates that 'telecommunications' may be a component of an 'information service'"); *Sw. Bell*, 461 F. Supp. 2d at 1078 ("The FCC described VoIP as a hybrid service that contains both 'telecommunications' and 'information' components."). Indeed, the Telecommunications Act's definition of "information service" includes the transmission of information via telecommunications. 47 U.S.C. § 153(24). Thus, it is of no significance to the present issue that the FCC found that VoIP providers provide telecommunications.

## 2.     Fixed and Nomadic VoIP Service

Defendants next contend that Charter Advanced is capable of tracking the jurisdictional confines of its customer calls, and is thus subject to state regulation in accordance with ¶ 56 of the *USF Order*. The FCC indicated in the *USF Order* "that an interconnected VoIP provider with the capability to track the jurisdictional confines of customer calls would no longer qualify for the preemptive effects of our *Vonage* Order and would be subject to state regulation." 21 F.C.C. Rcd. at 7546 ¶ 56. Charter Advanced does not dispute that its VoIP service is a fixed service, and it conceded as much during the PUC proceeding and again in the hearing before this Court.

There are several impediments to extending the FCC's statement in ¶ 56 to this action, however. First, the statement is no more than an indication of what the FCC might do, should it ever decide to answer the question of whether interconnected VoIP services are information services or telecommunications services, a decision it has

steadfastly refused to make.

Second, the context in which the statement was made weakens its impact. The FCC was discussing whether interconnected VoIP providers could rely on actual interstate telecommunications revenues to calculate their contributions to the universal service fund. The FCC's remark about a possible effect on preemption if a provider concedes an ability to track the location of calls, embedded in the middle of a detailed discussion of three calculation options, was more likely intended as a warning to providers to recognize the possible unintended consequences of their choices, rather than a determination about the nature of fixed services in general.

Third, whether a provider *can* track the geographic locations of callers is not the only inquiry, as indicated in *Vonage II* and *Vonage III*. The FCC indicated in *Vonage II* that if it were faced with the issue of whether to preempt state regulation of a fixed VoIP service with characteristics similar to DigitalVoice, it would do so. *Vonage II*, 19 F.C.C. Rcd. at 22404 ¶¶ 1, 32. The Court discusses the impossibility exception established in *Vonage II* further in Part III.B.3. *infra*, but it is relevant here to emphasize that not *all* fixed, interconnected VoIP services are necessarily subject to state regulation simply because the geographic locations of the calls can be determined. No court or the FCC has established such a blanket rule. Rather, in *Vonage III*, the Eighth Circuit recognized the propriety of the FCC's decision in *Vonage II* "to consider the economic burden of identifying the geographic endpoints of VoIP communications in determining whether it was impractical or impossible to separate the service into its interstate and intrastate components." 483 F.3d at 578. This is a "largely fact-driven inquiry requiring a high

level of technical expertise," and "[s]ervice providers are not required to develop a

mechanism for distinguishing between interstate and intrastate communications merely to

provide state commissions with an intrastate communication they can then regulate."

*Id.* at 578-79. *Vonage III* acknowledged that the preemption of state regulation of fixed

VoIP services is "an open issue." *Id.* at 583.

Fourth and finally, even if the law on fixed VoIP services were clear, the Court

cannot conclude on the limited record available at this stage of the litigation that Charter

Advanced is capable of easily and economically ascertaining the geographic start-, mid-,

and end-points of each call. On this motion to dismiss, the Court is confined to the

allegations of the complaint. That record does not establish that Charter Advanced is

able to determine the geographic location of its calls, or that even if Charter Advanced

could separate the intrastate and interstate components, its service would not be too

multifaceted, and tracking and recording geographic information would not be too

complex, to require it to do so. *See Vonage II*, 19 F.C.C. Rcd. at 22419 ¶ 23.

### 3.  The Impossibility Exception

Defendants argue that the impossibility exception established in *Vonage II* does

not apply here, and that no court or the FCC has ever applied the impossibility exception

to fixed VoIP services. But that does not foreclose a court or the FCC from doing so in

the future.

In *Vonage II*, the FCC acknowledged that *even if Vonage could directly identify*

*the geographic location of calls*, its service was far too multifaceted, and "the significant

costs and operational complexities associated with modifying or procuring systems to

track, record and process geographic location information as a necessary aspect of the service" would be prohibitive.  19 F.C.C. Rcd. at 22419 ¶ 23.  This statement indicates that the impossibility exception could apply to some fixed services.  Relatedly, the FCC also said that some "types of IP-enabled services having basic characteristics" such as a broadband connection, CPE, and enhanced features would be "practical[ly] inseverab[le]" and thus not subject to state regulation.  *Id.* at 22424 ¶ 32; *see id.* at 22404 ¶ 1.  The impossibility exception could apply to these services, as well, even if fixed.

The FCC has never directly repudiated its statement in *Vonage II* that if it were faced with the issue of fixed VoIP service, it would preempt state regulation.  The FCC's later statement in the *USF Order* suggesting that a provider who could track the locations of customer calls would be subject to state regulation was not a definitive ruling on the matter, and as discussed fully above, was made in the context of the universal service fund contribution requirements of 47 U.S.C. § 254.

*Vonage III* recognized that "when VoIP is offered as a fixed service rather than a nomadic service, the interstate and intrastate portions of the service *can be more easily distinguished*."  483 F.3d at 575 (emphasis added).  The court did not find, however, that interstate and intrastate portions of a fixed service can always be distinguished, nor that it would be economically feasible or easy to do so.

In light of this authority, the Court cannot conclude as a matter of law, on the limited record presented by Defendants' motion to dismiss, that Charter Advanced would be foreclosed from relying on the impossibility exception simply because it offers a fixed VoIP service.  The FCC has refused to establish a bright-line rule about whether fixed

VoIP services are a telecommunications service or an information service under the Telecommunications Act, and administrative decisions and case authority have consistently required a fact-intensive examination of the particular characteristics and functionality of the service.  Charter Advanced alleges here that it provides a VoIP service over a broadband Internet-capable cable; through specialized CPE known as an MTA; using data packets routed through Charter's IP network; resulting in a net protocol conversion from IP to TDM or TDM to IP; and capable of integrating features such as online web portals, integrating voice calling features with email accounts and cable video, accessing voicemails as either audio or text files, and identifying callers on subscribers' television screens.  Taking these allegations as true, it is plausible the impossibility exception could apply.

    **4.**    **The "Functional Approach" to Classifying a Service under the Telecommunications Act**

Defendants argue that the FCC has adopted a "functional approach" to classifying telecommunications services and information services under the Telecommunications Act, and under this approach, Charter Advanced VoIP service is a telecommunications service.

Defendants rely on *In re Connect America Fund*, 26 F.C.C. Rcd. 17633 (2011) ("*Connect America Order*"), in support of their position that the technology or facilities used to provide a service are immaterial when determining the service's classification. But the *Connect America Order* did not pertain to the definition of information services or telecommunications services.  It addressed whether voice telephony service should be

supported by federal universal service support mechanisms under 47 C.F.R. § 54.101.

*Id.* at 17633 ¶ 2.  The FCC decided to eliminate a list of nine supported services in favor

of adopting a blanket definition of "voice telephony" because it was "a more

technologically neutral approach that focuses on the functionality offered instead of the

technologies used, while allowing services to be provided over any platform." *Id.*  The

Court thus finds the *Connect America Order* inapplicable here, to the extent Defendants

rely on it for its discussion of a functional approach.

Defendants next assert that protocol processing used to facilitate the transmission

of voice communication does not affect the service's classification, citing the *Universal*

*Service Report*, 13 F.C.C. Rcd. at 11501 ¶ 52.  But Defendants misstate the FCC's

finding.  The FCC stated, in full:

> The regulatory classification of protocol processing is significant to the
> provision of universal service only to the extent that it affects the
> appropriate classification of Internet access service and IP telephony.  We
> find, however, for the reasons explained below, that Internet access services
> are appropriately classed as information services without regard to our
> treatment of protocol processing

*Id.*  Contrary to Defendants' position, the regulatory classification of protocol processing

*is* significant when it affects the classification of Internet access service and IP telephony.

Protocol processing is not significant to a classifying Internet access services, however,

because such services are properly classified as information services without regard to

protocol processing.

The FCC also found in the *Universal Service Report* that "[t]he protocol

processing that takes place incident to phone-to-phone IP telephony does not affect the

service's classification, under the Commission's current approach, because it results in no net protocol conversion to the end user." *Id.*  In the present case, by contrast, there is a net protocol conversion to the end user.

Next, Defendants contend that Charter Advanced's VoIP service is a telecommunications service under functional approach because "add-on features" do not alter the classification of a telecommunications service.  For this principle, Defendants cite *In re Communications Assistance for Law Enforcement Act and Broadband Access and Services,* 20 F.C.C. Rcd. 14989, 14998 ¶ 16 (2005) ("*CALEA Order*").  The *CALEA Order* addressed the Communications Assistance for Law Enforcement Act (CALEA), 47 U.S.C. § 1001 *et seq.*, and whether CALEA applied to broadband Internet access services and VoIP services.  But the *CALEA Order* did not address the Telecommunications Act, and the CALEA differs from the Telecommunications Act in significant respects.  For example, CALEA's definition of "telecommunications carrier" is more inclusive than the definition of "telecommunications carrier" in the Telecommunications Act.  20 F.C.C. Rcd. at 14993 ¶ 10.  Similarly, treatment of "information services" under CALEA is different than that under the Telecommunications Act, *id.* at 14996 ¶ 15; and CALEA does not use or define the term "telecommunications service," *id.* at 14998 ¶ 16.

> In contrast with the Communications Act, CALEA does not define or utilize the term "telecommunications service," it does not adopt the Communications Act's narrow definition of "telecommunications," and it does not construct a definitional framework in which the regulatory treatment of an integrated service depends on its classification into one of two mutually exclusive categories, *i.e.*, telecommunications service or information service.

*Id.* Consequently, the *CALEA Order*'s definition of "telecommunications service" is not relevant here.

With respect to the functional approach generally, Defendants contend that the classification of a VoIP service should depend on what is offered to the end user, and that VoIP service providers should not be allowed to evade state regulation by packaging telecommunications services with information services. In the *Universal Service Report*, the FCC adopted a functional approach to determine when a hybrid service[5] is an information service or a telecommunications service. 13 F.C.C. Rcd. ¶¶ 58-59. The type of facilities used is irrelevant under the functional approach, and the classification of a telecommunications service depends "on the nature of the service being offered to customers." *Id.* ¶ 59. If the user receives only pure transmission, it is a telecommunications service, but if the user can also receive enhanced functionality, it is an information service. *Id.*

The Court does not disagree with Defendants that the functional approach to classification may be employed here. But, under the functional approach described in the *Universal Service Report*, if applied to the allegations in Charter Advanced's complaint, Charter Advanced's VoIP service would seem to be an information service because the service offers more than the mere transmission of telecommunications; it offers enhanced

---

[5] A hybrid service is one in which "a provider offers a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information via telecommunications, *and* as an inseparable part of that service transmits information supplied or requested by the user." *Universal Service Report*, 13 F.C.C. Rcd. ¶ 56.

functionality.  According to Charter Advanced's allegations, its VoIP service is capable of offering features such as an online web portal that integrates voice calling features with email accounts, access to features associated with Charter's Internet and cable video offerings, access to voicemail as audio or text files, and caller ID information displayed on the subscriber's television screen.[6]

### 5.   Whether Charter Advanced's Service Is a Telecommunications Service Because It Is Offered to the Public for a Fee

Defendants argue that Charter Advanced's VoIP service meets the statutory definition of a telecommunications service because the service is offered to the public for a fee.  *See* 47 U.S.C. § 153(53).  If that were the entire test, the Court could disregard twenty years of case law and administrative decisions.  But in making this argument, Defendants overlook the very definition of "telecommunications" in § 153(50), which excludes transmissions without change in form or content of information, as well as the definition of "information service" in § 153(24), which is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications."  Dismissal is not warranted on this basis.

### 6.   The Telecommunications Systems Management Exception

Defendants contend that Charter Advanced's VoIP service is not an information service because it falls within the telecommunications systems management exception of § 153(24).  The Act's definition of "information services" excludes the use of any "capability for the management, control, or operation of a telecommunications system of

---

[6] On this Rule 12(b)(6) motion to dismiss, the Court does not consider Defendants' evidence of Charter Advanced's marketing or Charter Advanced's testimony to the PUC.

the management of a telecommunications service." 47 U.S.C.A. § 153(24). The

exception "covers services that may fit within the literal reading of the information

services definition, but that are used to facilitate the provision of a basic

telecommunications transmission service, without altering the character of that service."

*In re Implementation of the Non-Accounting Safeguards of Sections 271 & 272 of the*

*Commc'ns Act of 1934, As Amended*, First Report & Order & Further Notice of Proposed

Rulemaking, 11 F.C.C. Rcd. 21905, 21965 ¶ 123 (1996).

Defendants submit that Charter Advanced's VoIP service falls within the

telecommunications systems management exception because it merely facilitates the

provision of a basic telecommunications transmission service. If Defendant's simple

interpretation of the exception were true, it would negate nearly every court and FCC

decision on VoIP services. Every VoIP service provider facilitates the provision of a

telecommunications transmission service. The definition of "information service" under

the Telecommunications Act includes the transmission of information via

telecommunications. 47 U.S.C. § 153(24). If the transmission of information via

telecommunications fell within the telecommunications systems management exception,

the exception would swallow the rule.

The FCC has identified three categories of protocol processing services that fall

within the telecommunications systems management exception: (1) services "involving

communications between an end user and the network itself (*e.g.*, for initiation, routing,

and termination of calls) rather than between or among users"; (2) protocol processing

"in connection with the introduction of a new basic network technology (which requires

protocol conversion to maintain compatibility with existing CPE)"; and (3) services "involving internetworking (conversions taking place solely within the carrier's network to facilitate provision of a basic network service, that result in no net conversion to the end user)." *In re Implementation of the Non-Accounting Safeguards of Sections 271 & 272 of the Commc'ns Act of 1934, As Amended*, 12 F.C.C. Rcd. 2297, 2298-99 ¶ 106 (1997). Defendants do not discuss these categories or explain into which category Charter Advanced's VoIP service would fall. On the limited record before it, the Court concludes that none of the categories apply to Charter Advanced's VoIP service.

The first category does not appear to apply because Charter Advanced's protocol conversion permits communications "between or among users." That is, Charter Advanced's VoIP service allows its subscribers to communicate with subscribers to traditional telephone service, not just to Charter Advanced's network. The second category concerns only conversions "to maintain compatibility with existing CPE" when new basic network technology is introduced. But Charter Advanced is not converting call protocols to maintain compatibility with old customer equipment; rather, Charter provides new CPE that allows it to offer its subscribers additional IP-based services. The third exception applies only to "internetworking" that results in "no net conversion to the end user." This category would include, for example, calls originated in TDM format, then converted to IP format by the provider, then ending in TDM format. This was the format of the service at issue in the *AT&T Order*. Charter Advanced's VoIP service, by contrast, is IP to TDM. A call from a Charter Advanced subscriber enters Charter Advanced's network in IP format and exits the network in TDM format. Thus, there is a

net protocol conversion involved in Charter Advanced's VoIP service.

Defendants also rely on the *Open Internet Order* in support of their position that Charter Advanced's VoIP service falls within the telephone systems management exception. Defendants argue, inaccurately, that the FCC applied the exception in reclassifying broadband Internet service as a telecommunications service.

The FCC first determined in the *Open Internet Order* that broadband Internet access was a telecommunications service, but the FCC did not rely on the telecommunications systems management exception to reach that decision. The FCC then turned to the question of whether some capabilities offered *with* broadband Internet access service should be classified as information services, or as telecommunications services under the telecommunications systems management exception.

> To the extent that broadband Internet access service is offered along with some capabilities that would otherwise fall within the information service definition, they do not turn broadband Internet access service into a functionally integrated information service. To the contrary, we find these capabilities either fall within the telecommunications systems management exception or are separate offerings that are not inextricably integrated with broadband Internet access service, or both.

*Open Internet Order*, 30 F.C.C. Rcd. at 5765 ¶ 365. The specific capabilities identified by the FCC as falling under the telecommunications systems management exception— when they are "offered as part of a broadband Internet access service"—were (1) the domain name system, which is used simply to route information by matching Internet addresses entered by the user to the website's server, (2) caching of content, which is used to facilitate the transmission of information, and (3) network security functions such as call blocking, firewalls, and parental controls. *Id.* at 5765-66 ¶ 366, 5770-71 ¶ 372,

5771 ¶ 373.

These capabilities fell under the telecommunications systems management exception because they were offered *as a part of broadband Internet access service*. The FCC acknowledged that these capabilities "would otherwise fall within the information service definition." *Id.* at 5765 ¶ 365. Charter Advanced does not offer its VoIP service and related capabilities as part of a broadband Internet access service, however. Thus, the *Open Internet Order*'s discussion of the telecommunications systems management exception is not applicable here.

### 7.     Whether Charter Advanced's VoIP Service Is a Telecommunications Service under the *AT&T Order*

Defendants argue that Charter Advanced's VoIP service is substantially similar to the service described in the *AT&T Order* and determined by the FCC to be a telecommunications service. In that order, the FCC determined that the provision of a transmission with no net change in the form or content of information sent or received was a telecommunications service. 19 F.C.C. Rcd. at 7465 ¶ 12. The FCC limited its determination, however, to services similar to AT&T's that: "(1) use[] ordinary customer premises equipment (CPE) with no enhanced functionality; (2) originate[] and terminate[] on the public switched telephone network (PSTN); and (3) undergo[] no net protocol conversion and provide[] no enhanced functionality to end users due to the provider's use of IP technology." *Id.* at 7457-58 ¶ 1.

Charter Advanced's VoIP service, as described in the complaint, meets none of the criteria described by the FCC. First, Charter Advanced's VoIP service requires

specialized, IP-compatible CPE.  Second, the service in the *AT&T Order* involved calls that originated in TDM, were converted by AT&T to IP within its network, and then were converted back to TDM before transmission to the end user.  Thus, there was no net protocol conversion.  Charter Advanced's service, on the other hand, offers a net protocol conversion from IP to TDM or from TDM to IP.

Third, Charter Advanced's service has the capability to provide enhanced functionality.  Charter Advanced alleges it has the capability to offer an online web portal that integrates voice calling features with email accounts, other features associated with Charter's Internet and cable video offerings, access to voicemail as audio or text files, and caller ID information displayed on television screens.  (Compl. ¶ 22.)  AT&T had no such capabilities.

## 8.    Public Policy

In the event Charter Advanced's VoIP service is deemed an information service, Defendants ask the Court to dismiss Charter Advanced's claims on policy grounds because preemption of the PUC Order would undermine the policy of encouraging competitive neutrality.  The Court concludes dismissal is not warranted on this basis or at this time.  At this procedural stage, Charter Advanced VoIP's service has not been classified as an information service.  In addition, there are countervailing policies such as "long-standing national policy of nonregulation of information services" and a pro-competition market that allows information service providers to "'burgeon and flourish' in an environment of 'free give-and-take of the market place without the need for and possible burden of rules, regulations and licensing requirements.'"  *Vonage II*, 19 F.C.C.

43

Rcd. at 22415 ¶ 21.  "Competition and deregulation are valid federal interests the FCC may protect through preemption of state regulation." *Vonage III*, 483 F.3d at 580. Moreover, "any state regulation of an information service conflicts with the federal policy of nonregulation." *Id.* The tension between the policy of competitive neutrality advanced by Defendants and the policies underlying preemption is not atypical. Accordingly, the Court does not recommend dismissal of Charter Advanced's complaint on policy grounds.

## IV.     Recommendation

Defendants ask the Court, through their motion to dismiss, to determine that Charter Advanced's VoIP service is a telecommunications service as defined by the Telecommunications Act, and thus subject to state regulation.  The Court concludes, however, that Defendants have not established as a matter of law, under the standards applicable to a motion to dismiss, that Charter Advanced's VoIP service is a telecommunications service.  It remains plausible that Charter Advanced's VoIP service is an information service and that state regulation should be preempted.  The FCC has refused to issue a broadly applicable rule on the classification of VoIP services, and the relevant administrative decisions and case law establish that the classification is fact-driven and dependent on numerous factors.  The decisions reflected in the various case law and administrative authority submitted by both sides were made in the context of a full and complete factual record, and the same benefit should be afforded here.

Accordingly, based on the foregoing and all the files, records, and proceedings

herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion to Dismiss

Plaintiffs' Complaint [Doc. No. 14] be **DENIED**.

Dated: April 21, 2016                     s/ *Hildy Bowbeer*
                                                HILDY BOWBEER
                                                United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.