# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CHARTER ADVANCED SERVICES (MN), LLC, and CHARTER ADVANCED SERVICES VIII (MN) LLC, | Civil No. 15-3935 (SRN/KMM) |
| Plaintiffs, | |
| v. | |
| BEVERLY JONES HEYDINGER, in her official capacity as Chair of the Minnesota Public Utilities Commission; NANCY LANGE, in her official capacity as Commissioner of the Minnesota Public Utilities Commission; DAN LIPSCHULTZ, in his official capacity as Commissioner of the Minnesota Public Utilities Commission; JOHN TUMA, in his official capacity as Commissioner of the Minnesota Public Utilities Commission; and BETSY WERGIN, in her official capacity as Commissioner of the Minnesota Public Utilities Commission, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

David A. Handzo and Luke Platzer, Jenner & Block LLP, 1099 New York Avenue NW, Suite 900, Washington, D.C. 20001; and Steve Gaskins, Gaskins Bennett Birrell Schupp, LLP, 333 South Seventh Street, Suite 3000, Minneapolis, MN 55402, for Plaintiffs.

Andrew Tweeten, Minnesota Attorney General's Office, 1100 Bremer Tower, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Report and Recommendation ("R&R") of

Magistrate Judge Bowbeer dated April 21, 2016.  (Doc. No. 46.)  Defendants timely filed objections to the R&R.  (Doc. No. 47.)

In this dispute over the proper division of regulatory authority under the federal Communications Act of 1934, as amended by the Telecommunications Act of 1996, the Minnesota Public Utilities Commission ("MPUC") contends that federal law does not preempt Minnesota state law with respect to the fixed, interconnected Voice over Internet Protocol ("VoIP") service that Plaintiff Charter Advanced[1] provides over its broadband network.  Charter Advanced maintains its service is not subject to state regulation as a "telecommunications service," but rather constitutes an "information service," over which federal law precludes state regulation.[2]  E.g., Vonage Holdings Corp. v. Minnesota Pub. Util. Comm'n, 290 F. Supp. 2d 993, 994 (D. Minn. 2003) ("Vonage I") (noting "Congress has expressed a clear intent to leave the Internet free from undue regulation" and has "also differentiated between 'telecommunications services,' which may be regulated, and 'information services,' which like the Internet, may not").[3]

---

[1]     Plaintiffs Charter Advanced Services (MN), LLC, and Charter Advanced Services VIII (MN), LLC, are both indirectly wholly-owned subsidiaries of Charter Communications, Inc. (Doc. No. 1, at 3 ¶ 9).  This Court will refer to Plaintiffs collectively as either "Charter Advanced," as does the R&R, or simply "Charter."

[2]     Charter Advanced's service is now marketed as "Spectrum Voice."  Here, this Court will refer to it either as "Charter Phone," as Defendants do, or as "VoIP service," as the R&R does.

[3]     The MPUC and its Commissioners appealed to the Eighth Circuit the decision in Vonage I granting a permanent injunction prohibiting the commissioners from enforcing the state regulatory order.  But while that appeal was pending, the FCC issued an order preempting the MPUC order.  In the Matter of Vonage Holdings Corp., 19 F.C.C.R. 22404 (2004) ("Vonage II").  (The FCC has clarified "that this Commission, not the state commissions, has the

(continued...)

Following an Order by MPUC rejecting the position of Charter Advanced, Plaintiff filed its Complaint against the Chair and other Commissioners of the MPUC (collectively "Defendants"), in their official capacities, seeking declaratory relief that state regulation of its VoIP service is preempted by federal law, and injunctive relief prohibiting Defendants from seeking to enforce Minnesota regulation of its service.  (Doc. No. 1 at 13.)  Defendants filed a motion to dismiss under Rule 12(b)(6) (Doc. No. 14), and this Court referred that motion to Magistrate Judge Hildy Bowbeer (Doc.  No. 21).  Magistrate Judge Bowbeer issued a R&R concluding that Defendants had "not

---

[3](...continued)

responsibility and obligation to decide whether certain regulations" apply to particular services.  Vonage II, 19 F.C.C.R. at 22404-05 ¶ 1.)  Accordingly, the Eighth Circuit affirmed "the judgment of the district court on the basis of the FCC Order," having "conclude[d] that the FCC Order is binding on this Court and may not be challenged in this litigation."  Vonage Holdings Corp. v. Minn. Pub. Util. Comm'n, 394 F.3d 568, 569 (8th Cir. 2004).  Subsequently, the Eighth Circuit denied the petitions seeking review of the FCC's Vonage II order.  Minnesota Public Utilities Comm'n v. Federal Commun. Comm'n, 483 F.3d 570 (8th Cir. 2007) ("Vonage III").

Here, Defendants had asserted before the Magistrate Judge that the entire Vonage line of authority is inapposite, "as those authorities concern nomadic VoIP," rather than Charter Advanced's "fixed" VoIP service.  (Doc. No. 41 at 9.)  Defendants now object to the R&R's reliance on several "preemption authorities," including Vonage II, as addressing "different factual circumstances not applicable here."  (Doc. 47 at 3.)  This Court concludes, however, that the authorities at issue are hardly inapposite.  As the R&R explained, although neither the FCC nor various courts have provided a definitive answer to the precise question here of whether "Charter Advanced's fixed, interconnected VoIP service" is "an information service or a telecommunications service" (Doc. No. 46 at 11), several judicial decisions have ruled on similar issues and thus provide valid guidance here.  In Vonage I, for example, the district court addressed the issue of whether the computer-to-computer and telephone-to-computer forms of IP telephony (two of three such forms, the third being "telephone-to-telephone telephony") used in Vonage's "nomadic" service constituted "a telecommunications service or an information service."  290 F. Supp. 2d at 999 & n.9.  The court ruled that computer-to-computer telephony and telephone-to-computer constituted an information service, such that Vonage's service was not subject to MPUC's regulatory authority.  Id. at 994-1001.  Granted, "[a] distinction can be drawn . . . between what is referred to as 'nomadic' VoIP service and 'fixed' VoIP service," Vonage III, 483 F.3d at 575 (addressing the difficulty in distinguishing "the interstate and intrastate portions of the service"), but that distinction hardly renders those authorities inapposite here.

established as a matter of law" that Charter Advanced is a "telecommunications service,"

as opposed to an "information service," as those terms are defined by federal law.  The

R&R observed that the Federal Communications Commission ("FCC") "has refused to

issue a broadly applicable rule on the classification of VoIP services" and that applicable

law "establish[es] that the classification is fact-driven and dependent on numerous

factors."  (Doc. No. 46 at 44).  Thus "[i]t remains plausible that" Charter's service "is an

information service" such that "state regulation should be preempted."  (Id.)  Therefore

the R&R recommended denial of Defendants' motion to dismiss under Rule 12(b)(6) as

resolution of the issue must be afforded a "full and complete factual record."  (Id.)

Defendants now assert objections to the R&R.


## I.     STANDARD OF REVIEW

This Court "shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made."  28 U.S.C.

§ 636(b)(1).  This Court "may accept, reject, or modify, in whole or in part, the findings

and recommendations made by the magistrate judge."  Id.


## II.    DEFENDANTS' OBJECTIONS TO THE R&R

In arguing that Charter's service is a "communications service," state regulation of

which is permissible, Defendants characterize their objections as addressing matters of

law subject to *de novo* review and contend that the issue does not involve any "complex

fact-bound inquiry." (Doc. No. 47 at 6.)

A. **The Presumption Against Federal Preemption and the "Dual Regulatory" Scheme in the Telecommunications Arena**

Defendants first contend that the R&R erred by ignoring the presumption against preemption and that the Eighth Circuit has long recognized the "scheme of cooperative federalism embodied in the Telecommunications Act" of 1996. (Doc. No. 47 at 2.) Defendants argue that "[a]lthough the 1996 Act lifted this presumption with respect to state laws preventing competition among providers of local service, in other respects the presumption still applies." (Doc. No. 41 at 15.) They further contend that the R&R, "without explanation, overlooks the constitutional and statutory presumptions against preemption" (Doc. No. 47 at 2), and "errs by omitting any reference to [Defendants'] discussion of" the "indicia of legislative intent" to "preserve the states' role in regulating telecommunications" (id. at 3). This highly-limited view of preemption in the telecommunications arena that Defendants propose is too narrow.

While Defendants are correct that there is a presumption against preemption, that presumption is rebutted where Congress expresses its intent that "federal regulation supersede state law." Louisiana Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 368-70 (1986) (delineating certain "'varieties'" of preemption). Furthermore, preemption "may result not only from action taken by Congress; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." Id. at 369. In short, recognition of the presumption is simply the starting point for determining whether some particular matter of state law is in fact preempted; the presumption does not dictate

5

a conclusion of non-preemption.

And here, in the context of the Communications Act generally, it is beyond dispute that federal law can, and does, preempt certain aspects of state-law regulation.

### 1.     The Dual Regulatory System

There can be no dispute that federal law entered the telecommunications field upon the enactment of the Communications Act of 1934 and expanded its presence with the enactment of the Telecommunications Act of 1996.  "In 1934, Congress set up a dual regulatory regime for communications services."  Vonage II, 19 F.C.C.R. 22404, 22413 ¶ 16.  Congress established the FCC "[f]or the purpose of regulating interstate and foreign commerce in communication by wire."  47 U.S.C. § 151.  The federal Communications Act, as amended by the 1996 Act, provides that Chapter 5 of Title 47, that is, Sections 151 through 615, "shall apply to all interstate and foreign communication by wire," 47 U.S.C. § 152(a), but the FCC does not have "jurisdiction with respect to . . . regulations for or in connection with intrastate communication service . . . of any carrier," id. § 152(b).  And while Section 152(b) "fences off from FCC reach or regulation intrastate matters–indeed, including matters 'in connection with' intrastate service," Louisiana Pub. Serv. Comm'n, 476 U.S. at 370, Congress has expressly provided for preemption of state-law regulation of certain telecommunications, AT&T Corp. v. Iowa Util. Bd., 525 U.S. 366, 378 n.6 (1999) (noting that "with respect to matters addressed by the" Telecommunications Act of 1996, Congress "unquestionably" took "the regulation of local telecommunications competition away from the States").  Sections 151 and 152(b)

generally "enact a *dual* regulatory system," Louisiana Pub. Serv. Comm'n, 476 U.S. at

370 (emphasis in original), with respect to the myriad matters addressed by federal

telecommunications law, but such a system hardly means that the presumption is not, or

could not, be rebutted with respect to the particular issue here.

Similarly, the "scheme of cooperative federalism" noted by the Eighth Circuit in

Southwestern Bell Tel. Co. v. Connect Commc'ns Corp., refers to the "compromise"

under which "state commissions may have the final say" with "regard to purely state law

issues," but "'if the federal courts believe a state commission is not regulating in

accordance with federal policy they may bring it to heel.'" 225 F.3d 942, 948 (8th Cir.

2000) (quoting AT&T Corp. v. Iowa Util. Bd., 525 U.S. at 378 n.6 ).  The Eighth Circuit

decision addressed the division of authority over interconnection agreements.  See id. at

946-48 (addressing sections 251 and 252).  It does not expressly address the distinction

between "telecommunications services" and "information services" at issue here.

Defendants' general contention that "Congress's intent to preserve the states' role" in

regulating certain telecommunications does not decide the precise issue here.

In sum, this Court need not wade into the complexities of preemption under this

general scheme of "cooperative federalism" and the "dual regulatory system," because

with respect to the particular issue here, the FCC may preempt state regulation of

"information services."  Vonage III, 483 F.3d 570, 575 (8th Cir. 2007) (noting that while

Congress has deemed that an "information service" "should be free from almost all

federal and state regulation," with respect to a "telecommunications service," the

intrastate aspects of this service would be "regulated at the state level and the interstate aspects regulated at the federal level").[4]

### 2.      FCC Preemption of State Law Regulating "Information Services"

Regardless of any uncertainty with respect to the division of regulatory authority regarding telecommunications in general or in other specific contexts, there is simply no doubt as to federal authority here.  Under the authority granted it by Congress, the FCC "may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of" Chapter V of Title 47.  47 U.S.C. § 201(b).  Accord AT&T Corp. v. Iowa Util. Bd., 525 U.S. at 377-78 (noting extent of FCC's rulemaking authority).  And the FCC has issued a regulation stating that "information services" are "not regulated under title II of the Act."  47 C.F.R. § 64.702.  In short, "any state regulation of an information service conflicts with the federal policy of nonregulation," Vonage III, 483 F.3d at 580, such that any presumption against preemption is plainly rebutted.  The FCC itself has discussed "the distribution of authority over communications services between federal and state agencies under the Act," as well as "judicial authority that recognizes circumstances where state jurisdiction must yield to federal jurisdiction through the Commission's authority to preempt state regulations that thwart the lawful exercise of federal authority over interstate communications."  Vonage

---

[4]      Finally, the statutory note included in the 1996 Act–that the Act "shall not be construed to modify, impair, or supersede Federal, State or local law unless *expressly* so provided"–simply states that there shall be no implied federal preemption of state law, not that there shall not be any preemption.

I, 19 F.C.C.R. 22404, 22412 ¶ 15, 22414-28 ¶¶ 19-37.  Finally, insofar as Defendants'

preemption argument is simply that federal courts and agencies should not rebut the

presumption against preemption cavalierly, Qwest Corp. v. Scott, 380 F.3d 367, 374 (8th

Cir. 2004) (noting that "pre-emption is not to be lightly presumed"), it is clear that the

R&R, in recommending denial of Defendants' motion to dismiss, did not conclude that

federal law preempted state regulation of Charter Advanced's service, but merely

determined that it was, on this current limited record, "plausible" that federal law might

do so.  (Doc. No. 46 at 44.)[5]

### B.    Neither the Federal Statutory Language Nor the FCC's Interpretation of the Statute Dictates the Conclusion as a Matter of Law That MPUC May Regulate Charter's Service

Defendants first contend that the R&R erred as a matter of law because the federal

statutory language–particularly several statutory definitions–and agency interpretation by

the FCC compels the conclusion that Charter Advanced's service is subject to state

regulation as a "telecommunications service."  (Doc. No. 47 at 4-6.)  Thus, they claim

that dismissal is warranted "based on the plain language of the Act alone, contrary to the

Report's suggestion that this matter involves further complex fact-bound inquiry."  (Id. at

6.)  Simply stated, their statutory argument is that "Charter Phone plainly qualifies as a

telecommunications service as a matter of law" because (1) Charter Phone "indisputably

---

[5]    Charter Advanced argues that "[i]nsofar as the [Defendants] suggest that the Court should apply a presumption that services should be classified as "telecommunications services" rather than "information services" to avoid preempting state law, no authority supports such an approach."  (Doc. No. 61 at 6.)  The Court is similarly unaware of the application of the presumption on that level.

*provides* 'telecommunications'"; and (2) "telecommunications" "becomes a 'telecommunications service' when it is offered directly to the public for a fee." (Id. at 5 (emphasis added).)

They first argue that "Charter Phone is interconnected VoIP . . . and thus *provides* 'telecommunications,'" because "telecommunications" is defined as the transmission of information "without change in the form or content of the information as sent and received." (Id. at 4-5 (emphasis added) (citing the FCC's finding in paragraph 39 of the USF Order "that interconnected VoIP providers are 'providers of interstate telecommunications'" as "interconnected VoIP providers 'provide'" such a transmission).)[6]

They then further argue that Charter's service *offers* telecommunications as it is offered to the public for a fee and as it does not matter what "facilities" are used, such that "facts surrounding the technology Charter Phone uses to provide its fixed, interconnected VoIP service to consumers are irrelevant." (Id. at 5.) Defendants claim that "'telecommunications' becomes a 'telecommunications service' when it is offered directly to the public for a fee," and here "[i]t is undisputed that Charter offers Charter

---

[6]       Defendants also contend that the R&R erred as "there is not a change in the form or content of information sent and received because the Charter Phone caller speaks with their voice and the called party hears that same voice." (Id. at 5 & n.3.) Granted, it provides a "voice-in, voice-out" form of communication to the communicants. But their argument overlooks the fact that Charter's interconnected VoIP service employs IP-to-TDM conversion. *See infra* Section II.C.

Phone directly to the public for a fee." (Doc. 47 at 5-6.)[7] They contend that the Supreme

Court has stated that the definition of such service "hinges solely on whether the entity

'offer[s] telecommunications for a fee directly to the public.'" (Id. (quoting National

Cable & Telecomm. Ass'n v. Brand X, 545 U.S. 967, 996 (2005)).)[8]

But insofar as Defendants focus exclusively on whether a service is offered

"directly to the public for a fee," they misread Brand X by failing to address whether

Charter is "offering"–as that term is narrowly construed in this

context–"telecommunications." The fact that Charter Advanced sells its service to the

public is not controlling here. Rather, the issue is whether Charter Phone is a

telecommunications service or an information service, each of which is defined in terms

of what is "offered."

In Brand X, the Supreme Court held that the FCC, in the Cable Modem Order, had

---

[7]     "Telecommunications" is defined as "the transmission, . . ., of information . . .
without change in the form or content of the information as sent and received." 47 U.S.C. §
153(50). Defendants argue that the R&R erred by stating that the definition of
"telecommunications" "*excludes* transmissions without change in form or content of
information," because such a formulation "mistakes an element of the definition to be an
exception to the definition." (Id. at 4 n.2.) But as will be seen any such error is harmless here.
*See infra* Section II.C.

[8]     Defendants seize on this statement but ignore the context. The Court was
addressing, and rejecting, an "analogy between cable modem service and . . . enhanced-service
providers who own the transmission facilities used to provide those services . . . because cable
companies also own the facilities they use to provide cable modem service (and therefore
information service)," noting that under earlier rules "the Commission regulated such providers
more heavily than non-facilities-based providers." Brand X, 545 U.S. at 995. In rejecting that
analogy, the Court explained that [t]he Act's definition of 'telecommunications service' says
nothing about imposing more stringent regulatory duties on facilities-based 'information-service
providers. The definition hinges solely on whether the entity 'offer[s] telecommunications for a
fee directly to the public.'" Id. at 996.

permissibly construed the statutory definitions of "telecommunications service" and

"information service" in concluding that "cable companies that sell broadband Internet

service do not provide 'telecommunication service[s]' as the Communications Act defines

that term." 545 U.S. at 973-74. A "telecommunications service," is "the *offering* of

telecommunications for a fee directly to the public . . . regardless of the facilities used."

47 U.S.C. § 153(53) (emphasis added).   In contrast, an "information service" is

> the *offering* of a capability for generating, acquiring, storing, transforming,
> processing, retrieving, utilizing, or making available *information via
> telecommunications* . . . but does not include any use of any such capability
> for the management, control, or operation of a telecommunications system
> or the management of a telecommunications service.

Id. § 153(24) (emphasis added).  As will become clear, the particular–and

narrow–definition of "offer" in this statutory context, and its difference from "provide," is

crucial.

The Court noted that the FCC determined, based on the "integrated nature of

Internet access and the high-speed wire used to provide Internet access," "that cable

companies providing Internet access are not telecommunications providers," because

"consumers use their cable modems not to transmit information 'transparently,' such as

by using a telephone, but instead to obtain Internet access." Brand X, 545 U.S. at 978-79.

Thus, "cable companies offering broadband Internet access" "do not 'offe[r]

telecommunications service to the end user, but rather . . . merely us[e]

telecommunications to provide end users with cable modem service.'" Id. at 979. As the

Court noted, the FCC "conceded that, like all information-service providers, cable

companies use 'telecommunications' to provide consumers with Internet service . . . via the high-speed wire that transmits signals to and from an end user's computer," but that for the FCC "the question whether cable broadband Internet providers 'offer' telecommunications involved more than whether telecommunications was one necessary component of cable modem service." Id. at 988.

As the Court explained,

> [c]able companies in the broadband Internet service business "offe[r]" consumers an information service in the form of Internet access and they do so "via telecommunications," § 153(20) [now § 153(24)], but it does not inexorably follow as a matter of ordinary language that they also "offe[r]" consumers the high-speed data transmission (telecommunications) that is an input used to provide the service.

Id. at 989. "It is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product." Id. at 990. Thus the Court concluded that "the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering." Id. "In the telecommunications context, it is at least reasonable to describe companies as not 'offering' to consumers each discrete input that is necessary to providing, and is always used in connection with, a finished service." Id.

> What cable companies providing cable modem service and telephone companies providing telephone service "offer" is Internet service and telephone service respectively–the finished services, though they do so using (or "via") the discrete components composing the end product, including data transmission. Such functionally integrated components need not be described as distinct "offerings."

Id. at 991.  As the Court understood the FCC's position,

> the Commission did not say that any telecommunications service that is
> priced or bundled with an information service is automatically unregulated
> under title II.  The Commission said that a telecommunications input used
> to provide an information service that is not "separable from the data-
> processing capabilities of the service" and is instead "part and parcel of [the
> information service] and is integral to [the information service's] other
> capabilities" is not a telecommunications offering.

Id. at 997.  As Charter Advanced contends, Defendants neglect "that the FCC draws a

distinction between 'providing' telecommunications and 'offering' a telecommunications

service."  (Doc. No. 61 at 7 (emphasis in original).)

This distinction, and its relevance here, is clarified in the D.C. Circuit's decision in

Vonage Holdings Corp. v. F.C.C., 489 F.3d 1232 (D.C. Cir. 2007) ("Vonage IV").  At

issue in Vonage IV was whether VoIP providers are required to contribute to what is

known as the Universal Service Fund ("USF") under 47 U.S.C. § 254(d), one of the many

obligations imposed on common carriers subject to Title II.[9]   In particular, the issue was

whether the FCC, in the USF Order under review, had properly determined that "provide"

is a broader term than "offer."

Under section 254(d), "[e]very telecommunications carrier that *provides* interstate

telecommunications *services* shall contribute" to the fund under the "mandatory portion"

---

[9]        "The Act regulates telecommunications carriers, but not information-service
providers, as common carriers," which are subjected under Title II to many "mandatory"
obligations, including that to "contribute to the federal 'universal service fund'" under section
254(d).  Brand X, 545 U.S. at 975-76.  Accord AT&T Ruling, 19 F.C.C.R. 7457, 7460 ¶ 4 n.16
("Title II . . . imposes certain requirements on common carriers, including" requirements with
respect to "rates and terms," "tariffing," "interconnection," and contributions to the USF.), 7461
¶ 7.

stated in the first sentence of Section 254(d), and the FCC may, in its discretion, require

"[a]ny other provider of interstate telecommunications" to contribute to the fund under its

authority stated in the final sentence of Section 254(d), the "permissive portion."  Id. at

1236 (emphasis added).[10]

> The D.C. Circuit noted that the FCC's
>
> application of section 254(d) to interconnected VoIP providers involved two discrete decisions:  (1) that, unlike the verb "offer," the verb "provide" may apply to the act of supplying a component of an integrated product, and (2) that VoIP providers supply telecommunications as a component of their service.

Id. at 1240.[11]

With respect to the first decision–the distinction between provide and offer–the

court explained that because in Brand X "the Supreme Court upheld the Commission's

[narrow] interpretation of the word 'offer,'" the court now "face[d] only two issues:  has

---

[10]    The Act defines "telecommunications carrier," as relevant here, as "any *provider* of telecommunications services."  47 U.S.C. § 153(51) (emphasis added).  And as relevant here, "[a] telecommunications carrier shall be treated as a common carrier under this chapter" and thus be subject to the mandatory regulation under Title II of the Act, "only to the extent that it is engaged in providing telecommunications services."  Id.

[11]    The FCC earlier had requested comments as to "whether it should classify VoIP as a 'telecommunications service,'" such that "VoIP would be subject to mandatory Title II common carrier regulations," or as an "information service,'" such that "it would not."  Id. at 1235.  But later in the USF Order, the FCC deferred addressing that classification question, "ground[ing] its order in its permissive contribution authority," under which the FCC asserted it may impose this obligation regardless of whether a provider "is ultimately classified as a 'telecommunications service' or an 'information service.'"  Id. at 1236, 1238.  "Were the Commission to conclude that VoIP is 'an offering of telecommunications and therefore to classify it as a telecommunications service, VoIP providers would fall under section 254(d)'s mandatory contribution language."  Id. at 1239. "The scope of the Commission's *permissive* contribution authority, however, does not depend on whether VoIP is considered an 'offering' of either telecommunications or information.  Rather, the Commission's permissive contribution authority extends to '*provider[s]* of interstate telecommunications.'"  Id. (emphasis in original).

the Commission reasonably interpreted the word 'provide,' and was it reasonable for the Commission to give the word 'provide' a different meaning than the word 'offer'?"  Id. at 1238, 1240.  The court concluded that both of the Commission's determinations were reasonable.

Noting that the Commission's permissive contribution authority extends to "*provider[s]* of interstate telecommunications," the court stated that as the Commission determined, "[t]he verb 'provide,' . . . 'is a different and more inclusive term than 'offer.'"  Id. at 1239.  "Under this definition, the Commission explained, the verb 'provide' is broad enough to include the act of supplying a good or service as a component of a larger, integrated product."  Id.  As the court further noted, "[a]fter concluding that a 'provider of telecommunications' need only supply telecommunications as a component of its finished product, the Commission explained that VoIP does in fact include telecommunications as a component" because the "'transmission . . . of information'" required by the definition of "telecommunications" is provided by "interconnected VoIP services" "by virtue of their interconnection with the PSTN [public switched telephone network]."  Id.

And with respect to the second "discrete decision" that the FCC took, the court upheld the FCC's "finding that VoIP providers supply telecommunications as a component of their service insofar as they 'suppl[y] PSTN transmission *itself* to end users.'"  Id. (emphasis in original).  In addressing certain challenges to the FCC's finding, the court rejected the argument that because "'only telecommunications, and not

16

'information services,' may be subject to the USF contribution obligations under the Act,'" the Commission erred by requiring VoIP providers to contribute. Id. at 1241. The court reasoned that "although 'information service' and telecommunications service' are mutually exclusive categories," it is possible that a "provider of 'information services'" could "also be a 'provider of telecommunications' for the purposes of section 254(d)." Id. at 1241.  "Indeed, the Act clearly contemplates that 'telecommunications' may be a component of an 'information service.'"  Id.

In sum, Brand X did not answer the question raised here, but rather, in conjunction with Vonage IV, merely frames the issue, that is, does Charter Advanced, in selling Charter Phone to the public, "*offer*" "telecommunications," or does it "offer" the capability to perform certain functions with respect to "information via telecommunications"–even if that information service would include telecommunications as a component.  And as the FCC itself has stated, "[w]e observe that the critical distinction between a telecommunications service and an information service turns on what the provider is 'offering.'"  Open Internet Order, 30 F.C.C.R. 5601, 5757 ¶ 355.  In short, a *provider* of interstate communications is not necessarily one who *offers* "telecommunications."

Charter Advanced contends that its VoIP service "originates and transmits calls using Internet Protocol ('IP') . . . instead of legacy communications protocols used by traditional telephone networks" and that it therefore is an "information service" because in order to allow "subscribers to place calls to . . . the public switched telephone network

('PSTN') it must convert voice data between IP and time-division multiplexing ('TDM'), the protocol used for most PSTN interconnections." (Doc. No. 61 at 2-3.) "This ability to convert call protocols offers the 'capability' of 'transforming' and processing information," such that Charter's service is an "information service." (Id. at 3.)[12]

Moreover, Charter notes that it "offers not only voice call transmission, but also other service features facilitated by its use of IP," and those "advanced functionalities would indisputably be 'information services' if offered separately." (Id. at 4.) And "where service features are 'intertwined,' rather than 'incidental,'" Charter contends that the FCC has concluded that one must "classify the *entire offering*, not each service component separately," such that Charter's "complete Spectrum Voice feature set renders" that service an "information service." (Id.) In short, Charter Advanced contends that while Charter Phone might provide "communications" as a component of its service, the overall service is an "information service."

Defendants contend that the R&R "ignores and fails to defer to the FCC's explicit conclusion [in the USF Order] that interconnected VoIP–the precise service Charter *offers*–fits within th[e] definition" of "telecommunications." (Id. at 5 & n.3 (emphasis added).) But the FCC found that interconnected VoIP providers are "*providers of*

---

[12]     Charter Advanced's service is an "interconnected VoIP service" because it "allows users to communicate not only with other VoIP users . . ., but also with users of traditional telephone networks." (Doc. No. 1, ¶ 21)   In the latter instance, "calls must be converted from IP to TDM, and vice versa." (Id.)   Moreover, it is a "fixed" service as it is accessed via "a specialized piece of equipment installed in [the customer's] home." (Id. ¶ 19.) Such a service is different from a "nomadic" service, which allows access from anywhere a customer can access the Internet.

interstate telecommunications," USF Order, 21 F.C.C.R. 7518, at 7539 ¶ 39 (2006) (emphasis added).  And the fact that Charter Advanced might provide interstate telecommunications is not the same issue as whether it was "*offering*" "telecommunications."  As the FCC expressly noted in the USF Order on which Defendants rely, "[u]nlike providers of interstate telecommunications services, . . . providers of interstate telecommunications do not necessarily 'offer' telecommunications 'for a fee directly to the public.'"  Id. ¶ 38.

In sum, by gliding over the crucial distinction between "offering" and "providing," Defendants attempt to ignore unresolved fact issues.  The Court concludes that the R&R did not err in stating that "[i]t remains plausible that Charter Advanced's VoIP service is an information service" because "the classification is fact-driven and dependent on numerous factors."  (Doc. No. 46 at 44.)

Indeed, one of those issues is whether, even if a particular service would otherwise be found to constitute an "information service," the "telecommunications management exception" precludes such classification.

### C.	Defendants' Alternative Argument–That Charter Phone Falls Within the Telecommunications Management Exception to the Definition of an "Information System"–Is No More Compelling

In the alternative, Defendants contend that even if Charter's service generally could be deemed an "information service," it is nevertheless "expressly and indisputably excluded from the Act[s] definition of "information service," because such a service "does not include any use of" the capability for "generating, acquiring, storing,

transforming, processing, retrieving, utilizing, or making available information via telecommunications" for "the management, control, or operation of a telecommunication system or the management of a telecommunication service."  (Doc. No. 47 at 6 (quoting 47 U.S.C. § 153(24)).)  As the FCC has explained, "the exception 'covers services that may fit within the literal reading of the information services definition, but that are used to facilitate the provision of a basic telecommunications transmission service, without altering the character of that service.'"  (Doc. No. 46 at 39 (quoting the Non-Accounting Safeguards Order, 11 F.C.C.R. 21903, 21965 ¶ 123 (1996).)

Defendants claim that the R&R "improperly disregards" the FCC's consideration of the exception in the Open Internet Order and that the R&R's reliance instead on the Non-Accounting Safeguards Order is "misplaced."  (Doc. No. 47 at 7-8.)[13]  Defendants contend that the Non-Accounting Safeguards Order "has been eclipsed by subsequent FCC decisions more directly on point" (id. at 8), and that "the 20-year-old Non-Accounting Safeguards Order" has been rendered irrelevant by "more recent and pertinent FCC authority" applying the functional approach (id. at 10).[14]

---

[13]     In a separately-enumerated section, section IV, Defendants argue that the R&R failed to apply the appropriate FCC orders.  Defendants contend that "[t]he weight of FCC precedent strongly supports dismissal" and that the USF Order, the Open Internet Order, the Connect America Order, the Universal Service Report and other FCC decisions–but not the Non-Accounting Safeguards Order–control here.  (Doc. No. 47 at 10-12.)  But this argument is addressed to issues such as the telecommunications management exception and the impossibility exception that the Defendants address in other sections entitled with respect to those particular issues.  Accordingly, the Court will address such arguments in their appropriate context, namely here with respect to the telecommunications management exception.

[14]     The Court observes that the F.C.C. has cited the Order at least as recently as 2004 in the AT&T Order, 19 F.C.C.R. 7457, 7460-62 ¶¶ 6-8.

At this early juncture of the proceedings, however, the Court need not determine which approach governs to the exclusion of the other–nor even that there is only one proper approach–as the result is the same here under either.   The Court also notes that the FCC, in the Non-Accounting Safeguards Order, stated that "[t]his proceeding is *one of a series of interrelated rulemakings* that collectively will implement the telephony provisions of the 1996 Act."  11 F.C.C.R. 21905, 21908 ¶ 2 (emphasis added).  And as the R&R stated, "[t]he Court does not disagree with Defendants that the functional approach to classification may be employed here."  (Doc. No. 46 at 37.)

### 1.      Analysis Under the Non-Accounting Safeguards Order

As the R&R explained,

> [t]he FCC has identified three categories of protocol processing services that fall within the telecommunications systems management exception: (1) services "involving communications between an end user and the network itself (*e.g.*, for initiation, routing and termination of calls) rather than between or among users"; (2) protocol processing "in connection with the introduction of a new basic network technology (which requires protocol conversion to maintain compatibility with existing CPE)"; and (3) services "involving internetworking (conversions taking place solely within the carrier's network to facilitate provision of a basic network service, that result in no net conversion to the end user)."

(Doc. No. 46 at 39-40 (quoting Non-Accounting Safeguards Order, 11 F.C.C.R. 21905, as amended, 12 F.C.C.R.  2297, 2298-99 ¶ 106).)[15]  The R&R noted that Defendants had not

---

[15]      Defendants also contend that the Non-Accounting Safeguards Order expressly limits its application so as not to be of any relevance here.   (Doc. No. 47 at 10.)  But that Order simply states that it "addresses only the non-accounting separate affiliate and nondiscrimination safeguards in sections 271 and 272 [of the Telecommunications Act].  The classification of BOC affiliates or independent LECs (and their affiliates) as dominant or non-dominant will be addressed in a separate Report and Order in this docket."  11 F.C.C.R. 21905, 21910 ¶ 5 (1996).

(continued...)

discussed these categories or explained into which category Charter Advanced's service would fall, but nevertheless "conclude[d] that none of the categories apply." (Id. at 40.)

Defendants now take issue with the R&R's discussion of the second and third categories, because the R&R "fails to recognize that the protocol processing and conversion alleged to be included in Charter Phone . . . is used in connection with new basic network technology [the second category] or for internetworking [the third category]." (Doc. No. 47 at 9.)  They assert that

> Charter's alleged protocol processing and conversion result in no net conversion to the end user because, evaluated end-to-end, any processing or conversion occurs solely on Charter Phone's network.  Charter Phone's protocol processing and conversion are accordingly employed "merely to facilitate provision of an overall basic service."

(Id.)

The R&R rejected the application of the second category of the exception because it "concerns only conversions 'to maintain compatibility with existing CPE [customer premises equipment]' when new basic network technology is introduced," whereas Charter Advanced is not converting call protocols for such a purpose, but rather is providing "new CPE that allows it to offer its subscribers additional IP-based services." (Doc. No. 46 at 40.)  Charter Advanced claims that it "does not rely on any protocol conversion between a consumer's home wiring and the modem used to access Spectrum

_____

[15](...continued)
Defendants fail to explain how this limiting distinction negates the relevance of the Order here. The Order addressed the scope of "the services that are included in the statutory definition of 'information service.'"  Id. at 21954-56 ¶¶ 99-103.  Likewise, the Order addressed "protocol processing" and "protocol conversion."  Id. at 21956-58 ¶¶ 104-106.

Voice," but rather "relies on the distinct protocol conversion that takes place between Charter's *network* and the public switched telephone *network*."  (Doc. No. 61 at 12 (emphasis in original).)  In short, because the issue is one of contested fact, the Court may not conclude that the second category of the exception applies here so as to preclude Charter Phone from being an "information service."

And with respect to the third category, the R&R stated that unlike the format of service at issue in the <u>AT&T Order</u>, which concerned a TDM to IP to TDM conversion, Charter's service "is IP to TDM," such that here "there is a net protocol conversion." (Doc. No. 46 at 40-41.)[16]  Because Charter's service is "interconnected"–that is, it also allows communications with traditional telephone networks, *see supra* note 12–the R&R explained it "offers a net protocol conversion from IP to TDM or from TDM to IP."  (<u>Id.</u> at 43.)  As the Complaint alleges, in order for subscribers of Charter's service to communicate with users of traditional telephone service, "calls must be converted from IP to TDM, and vice versa."  (Doc. No. 1, ¶ 21.)  Defendants fail to explain how their characterization of this service is factually accurate despite the allegations of the Complaint.  Thus they also fail to show that the reasoning of the R&R was in error.

As the R&R correctly observes, the FCC in that Order "emphasized that our decision is limited to the type of service" AT&T provided: "an interexchange service that: (1) uses ordinary customer premises equipment (CPE) with no enhanced functionality; (2)

---

[16]     Here, in a section separate from that expressly devoted to the exception, Defendants contend that the "Report repeats this error"–purportedly failing "to acknowledge the FCC's affirmation as a phone-to-phone IP telephony is a 'no net' protocol conversion"–"in its treatment of the *AT&T Order*."  (Doc. No. 47 at 12 n.5.)

originates and terminates on the public switched telephone network (PSTN); and (3)

undergoes no net protocol conversion and provides no enhanced functionality to users due

to the provider's use of IP technology."  AT&T Order, 19 F.C.C.R. 7457, 7457-58 ¶ 1.

The R&R stated that Charter's service "meets none of the criteria described by the FCC."

(Doc. No. 46 at 42.)

Even assuming that Defendants are contending that the R&R erred as a matter of

law by "conclud[ing] that none of the categories apply," the Court finds that these issues

raise questions of fact, such that it can not sustain Defendants' objection, which seeks a

finding that one or more of the categories apply as a matter of law so as to categorize

Charter Phone as falling within the telecommunications management exception and thus

preclude the service from being an "information service."  Indeed, Defendants contend

that resolution as a matter of law of the issue of protocol conversion "is premature and

incorrect."  (Doc. No. 47 at 8 n.4 (claiming "there is a contested issue of fact" on the

issue).)  But that contention hardly serves to support their general claim that the

telecommunications management exception necessarily applies here as a matter of law.

### 2.      Analysis Under the Functional Approach

Noting that this exception is a codification of "the functional approach to

classification"–"which classifies a service based on what is functionally offered to the end

user"–Defendants contend that the R&R fails to apply the Open Internet Order, the

Connect America Order, and the Universal Service Report.  (Doc. No. 47 at 6, 10.)[17]

---

[17]      As noted above, *see supra* note 13, in addition to Section III of their objections

(continued...)

***Open Internet Order***

In contending that the Open Internet Order is controlling here to the exclusion of

the Non-Accounting Safeguards Order, Defendants argue that the FCC "determined that

certain capabilities fall within the . . . exception not because they are offered as part of a

broadband Internet access service, but instead because these capabilities are incidental to

and do not alter the fundamental character of the underlying telecommunication service."

(Doc. No. 47 at 7.)  Defendants contend that the FCC's reasoning with respect to the

capabilities at issue in the Open Internet Order also applies here with respect to Charter

Phone, because Charter Phone's features "'only trivially affect[ ]' consumers' 'ability to

convey and receive information using the call' or they are 'separate offerings that are not

inextricably integrated with [the service], or both.'"  (Id. (quoting Open Internet Order).)

As alleged in the Complaint, "[i]n addition to allowing voice services to be

provided over broadband cable and Internet facilities, Charter Advanced's use of IP

within its network also allows it to offer numerous advanced communications features to

its subscribers."  (Doc. No. 1, ¶ 22.)

> Specifically, because the voice signals in Charter Advanced's
> interconnected VoIP service are already formatted as IP packets and
> traverse IP-based equipment within Charter's network, Charter Advanced
> can easily and seamlessly integrate Internet-based features into its service
> offering.  For instance, Charter Advanced is able to offer an online web
> portal (*i.e.*, a website accessible to Charter users over any Internet
> connection) that integrates subscribers' voice calling features with their

---

[17](...continued)
brief, which expressly addresses the exception, Defendants also address the functional approach
in a separately enumerated section, Section IV, regarding "Agency Precedent."  (Doc. No. 47 at
10-12.)  The Court addresses those arguments here.

> email accounts and other features of Charter's high-speed Internet and cable
> video offerings, offer subscribers (via the same web portal) access to their
> voicemails as both electronic audio files and automatically transcribed to
> text, as well as display caller ID information for incoming calls on
> subscribers' television screens.

(Id.)

But Defendants' attempted analogy to the Open Internet Order assumes too much.

In the Open Internet Order, the FCC first found that broadband Internet access service is a

telecommunications service.  30 F.C.C.R. 5601, 5763 ¶ 363.  Specifically, the FCC found

that what such service providers offer "are separate services that are best characterized as

(1) a broadband Internet service that is a telecommunications service; and (2) 'add-on'

applications, content and services that are generally information services."  Id. at 5750 ¶

341.  In addition, "we find that broadband Internet access service is today sufficiently

independent of these information services [such as email and online storage] that it is a

"separate 'offering.'"  Id. at 5758 ¶ 356.

Here, however, there has been no FCC determination that Charter's service is, like

broadband Internet access service, a telecommunications service.  Nor has there been any

determination that any additional capabilities Charter Advanced provides are a "separate

offering."  The FCC further found

> that domain name service (DNS) and caching, when provided with
> broadband Internet access service, fit squarely within the
> telecommunications management exception to the definition of an
> "information service."  Thus, when provided with broadband Internet
> access services, these integrated services do not convert broadband Internet
> access services into an information service.

Id.  Again, there has been no determination that Charter's additional capabilities are

26

analogous to DNS and caching.

In addition, the Court notes that the FCC then separately determined that "[w]e further find that broadband Internet access service is not an information service."  Id. at 5765 ¶ 365.

> To the extent that broadband Internet access service is offered along with some capabilities that would otherwise fall within the information service definition, they do not turn broadband Internet access service into a functionally integrated information service.  To the contrary, we find these capabilities either fall within the telecommunications systems management exception or are separate offerings that are not inextricably integrated with broadband Internet access service, or both.

Id.  No such comparable findings have been made here.  Nor should they on a motion to dismiss.

### USF Order

With respect to the USF Order–which required "providers of 'interconnected VoIP services' . . . to contribute" to the USF–Defendants argue that because that Order addressed Section 254 "contributions, made by a 'telecommunications carrier,' defined as a provider of telecommunications services," the Order is not only relevant to "the classification question before this Court," but "mandates judgment" in their favor.  (Doc. No. 47, at 10-11 (citing 47 U.S.C. §§ 153(51), 254(d))).)  Granted, Section 254(d) provides that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute" to a fund "established by the Commission." 47 U.S.C. § 254(d) (emphasis added).  But the FCC was not addressing the "mandatory" obligation of that provision.  Rather, it based its decision on the "permissive" authority to

require, in the FCC's discretion, "[a]ny other *provider* of interstate telecommunications"

"to contribute . . . if the public interest so requires." Id. § 254(d) (emphasis added).  And

as explained above, *see supra* Section II.B., there is a difference between "provide" and

"offer," and the classification question before this Court is whether Charter Advanced's

service "offers" "telecommunications."  In short, although Charter Advanced might be

"provid[ing] interstate telecommunications," the FCC's ruling that such VoIP providers

must contribute does not determine that Charter Phone is an offering of

telecommunications such that it provides "interstate telecommunications *services*."[18]

        In fact, the USF Order, on which Defendants rely, itself confirms this

understanding, thereby largely undercutting their argument here.  As that order stated, the

---

        [18]      Defendants assert that the Connect America Order, 26 F.C.C.R. 17633, 2011 WL
5844975 ("CAF I"), also supports its position on the functional approach, and is relevant here for
the same reason as the USF Order–that "only a telecommunications carrier can qualify for a
subsidy."  (Doc. No. 47 at 11.)  But CAF I addresses who shall be eligible to *receive* universal
service support.  Under Section 254(e), "only an eligible telecommunications carrier designated
under section 214(e) of this title shall be eligible to receive" such support.  47 U.S.C. § 254(e).
Granted, a "telecommunications carrier" is "any provider of telecommunications services," but
"telecommunications service" means the "offering" of "telecommunications," and that term is
defined as "the transmission . . . of information . . . *without change in the form or content of the
information as sent and received*.  47 U.S.C. § 153(50), 153(51) & 153(53) (emphasis added).
And whether Charter Advanced's service involves such change is a question–one of fact–at issue
here.  This Court thus agrees with the R&R that the Connect America Order does "not pertain to
the definition of information services or telecommunications services," but rather the funding
mechanisms for the Universal Service Fund.  (Doc. No. 46 at 34-35.)  As that order itself
expressly stated, "[o]ur authority to promote universal service in this context does not depend on
whether interconnected VoIP services are telecommunications services or information services
under the Communications Act."  26 F.C.C.R. 17633, 17685 ¶ 63, 2011 WL 5844975, **18.
Insofar as the Connect America Order simply observes that the FCC, in a prior order, had
adopted an "approach that focuses on the functionality offered instead of the technologies used,"
the Order merely reiterates prior authority and does not provide any new analysis relevant here.
On reconsideration, the FCC "modifie[d] on its own motion two aspects of" CAF I, but with no
relevance here.  Connect America Order, 26 F.C.C.R. 17633, 2011 WL 6778613 ("CAF II").

FCC "require[s] providers of 'interconnected VoIP services . . . to contribute to the federal USF." 21 F.C.C.R. 7518, 7535 ¶ 34. And "[t]o the extent interconnected VoIP services are telecommunications services, they are of course subject to the *mandatory* contribution requirement of section 254(d)." Id. (emphasis added). That authority extends to "[e]very telecommunications carrier that provides interstate telecommunications services." 47 U.S.C. § 254(d). But "[t]he Commission has not yet classified interconnected VoIP services as 'telecommunications services' or 'information services' under the definitions of the Act. Again here, we do not classify these services." 21 F.C.C.R. 7518, 7537 ¶ 35. Accordingly, the FCC clarified that "we find that interconnected VoIP providers are 'providers of interstate telecommunications under section 254(d)" under the FCC's *permissive* authority." Id. at 7537 ¶ 35. That authority, in contrast, extends to "[a]ny other provider of interstate telecommunications." 47 U.S.C. § 254(d).

In sum, while interconnected VoIP providers are "providers of interstate telecommunications," that finding did compel any conclusion that such providers are "providers of interstate telecommunications *services*" so as to subject them to mandatory contributions. As the FCC expressly clarified, "[u]nlike providers of interstate telecommunications *services*, . . . providers of interstate telecommunications do not necessarily 'offer' telecommunications 'for a fee directly to the public,'" because "'provide' is a different and more inclusive term than 'offer.'" Id. ¶¶ 38, 39.

Indeed, the D.C. Circuit's decision in "Vonage IV"–which reviewed and upheld

the USF Order in relevant part–clarified that "a 'provider of telecommunications' need only supply telecommunications as a component of its finished product."  489 F.3d 1232, 1239 (D.C. Cir. 2007) (vacating the USF Order in part).   In addition, the FCC has stated that "Internet access, *like all information services*, is provided 'via telecommunications.'" Universal Service Report, 12 F.C.C.R. 8776 at ¶ 68 (emphasis added).  But the fact that information services are provided via telecommunications does not render the information services an "offering of telecommunications services" because the FCC has maintained that "Congress intended 'telecommunications service' and 'information service' to refer to separate categories of services."  Id. ¶ 57.   Accord id. ¶ 13 ("We conclude, as the Commission did in the *Universal Service Order*, that the categories of 'telecommunications service' and 'information service' in the 1996 Act are mutually exclusive.").  "We find generally . . . that Congress intended to maintain a regime in which information service providers are not subject to regulation as common carriers merely because they provide their services 'via telecommunications.'"  Id. ¶ 21.

### Universal Service Report

Regarding the Universal Service Report, Defendants assert that the Report states that "[t]he protocol processing that takes place incident to phone-to-phone IP telephony does not affect the service's classification . . . because it results in no net protocol conversion to the end user."  (Doc. No. 47, at 11-12 (quoting Universal Service Report, 13 F.C.C.R. 11830, ¶ 52).)  They thus dispute the R&R's conclusion that they "misstate the FCC's finding" as to phone-to-phone IP telephony because the FCC purportedly

concluded "as a matter of law" that "phone-to-phone IP telephony is a 'no net' protocol

conversion."  (Id. at 12.)  The R&R noted that "[t]he FCC stated in full:

> The regulatory classification of protocol processing is significant to the
> provision of universal service only to the extent that it affects the
> appropriate classification of Internet access service and IP telephony.  We
> find, however, for the reasons explained below, that Internet access services
> are appropriately classed as information services without regard to our
> treatment of protocol processing."

(Doc. No. 46 at 35.)  The R&R thus stated that

> [c]ontrary to Defendants' position, the regulatory classification of protocol
> processing *is* significant when it affects the classification of Internet access
> service and IP telephony.  Protocol processing is not significant to . . .
> classifying Internet access services, however, because such services are
> properly classified as information services without regard to protocol
> processing.

(Id. (emphasis in original).)   The R&R thus discloses no error on this particular point.

The issue before the FCC was whether "transmission services incorporating

protocol processing should be treated as telecommunications services" or information

services.  Universal Service Report, 13 F.C.C.R. 11830, ¶ 49.  The FCC noted that some

had argued, based on the legislative history, that "the fact that a service involves protocol

processing . . . should not lead to its classification as an information service," but that the

Non-Accounting Safeguards Order concluded that "those protocol processing services

that had qualified as 'enhanced' should be treated as 'information services,'" but that

"certain protocol processing services that result in no net protocol conversion to the end

user are classified as basic services" such that they "are deemed telecommunications

services."  Id. ¶¶ 49-50.  The FCC did not resolve the issue, however, because it lacked an

adequate basis in the record to do so.  Id. ¶ 52.  And it explained that it need not do so to resolve the issues at hand because "Internet access services are appropriately classed as information services without regard to our treatment of protocol processing."  Id.

Here, the issue is not one of "Internet access service," but rather the classification of Charter Phone.  And the Universal Service Report did not rule on that.  The FCC noted that it would consider "the regulatory status of various forms of 'phone-to-phone IP telephony service," and the record currently before it "suggests that *certain* of these services lack the characteristics that would render them 'information services,'" and that they "instead bear the characteristics of 'telecommunications services.'"  Id. ¶ 3 (emphasis added).  But the FCC stated that it did "not believe it is appropriate to make any definitive pronouncements in the absence of a more complete record focused on individual service offerings."  Id.

The R&R noted the FCC adopted a functional approach to determine when a hybrid service–that is, one that offers not only the capability for performing certain actions with respect to "information via telecommunications," but also "as an inseparable part of that service transmits information supplied or requested by the user"–is an information service or a telecommunications service.  (Doc. No. 46 at 37.)  And "the classification of a telecommunications service depends "'on the nature of the service being offered to customer.'"  (Id. (quoting 13 F.C.C.R. 11830, at ¶ 59).)  It further noted that it did "not disagree with Defendants that the functional approach to classification may be employed here."  (Id.)  But, if that approach were applied here, the service "would

seem to be an information service because the service offers more than the mere transmission of telecommunications; it offers enhanced functionality." (Id. at 37-38.)

This Court concludes that the R&R did not err in its treatment of the USF Order because the FCC's discussion pertains to the obligation imposed by Section 254 on a "*provide[r]* of interstate telecommunications," not an entity that is "*offering telecommunications*" so as to be a "telecommunications service."

### 3.    Conclusion

In sum, the Court rejects Defendants' argument that the Non-Accounting Safeguards Order is irrelevant here.  Moreover, whatever FCC ruling or rulings are applicable, there is no basis to conclude now as a matter of law that Charter Phone necessarily falls within the telecommunications management exception.  That issue is simply too fact dependent.[19]

### C.    The Impossibility Exception

Defendants argue that the impossibility exception–under which state regulation is preempted if a particular telecommunications service can not be separated into interstate

---

[19]        Finally, Defendants take issue with the form of the R&R's phrasing of its determination regarding net protocol conversion.  The R&R stated that "there is net protocol conversion" here, suggesting that such was a final legal conclusion. They contend that resolution of the issue "is premature and incorrect."  (Doc. No. 47 at 8 n.4 (claiming "there is a contested issue of fact" on the issue).)   This Court would agree, if that is what the R&R did, in fact, mean, but this Court does not read the R&R so literally.  As the R&R also stated, "*[o]n the limited record before it*, the Court concludes that none of the categories apply to Charter Advanced's VoIP service." (Id. at 40 (emphasis added).)  In other words, there was no basis to conclude, on this Rule 12(b)(6) motion, that any of the categories of the exception necessarily applied so as to preclude Charter's service from being deemed, on a fuller record, an information service.  Thus, this Court does not read the R&R to have erred on this point.  But the Court does agree with Defendants that there is a contested issue of fact on this point.

communications, which are governed by federal law, and intrastate communications, which properly may be regulated also by state law–does not apply because Charter's service "has the capability of determining the geographic location of customers calls." (Doc. No. 47 at 12.)   As the Eighth Circuit has explained,

> [u]nder the impossibility exception, the FCC may preempt all state regulation of services which would otherwise be subject to dual control if it is impossible or impractical to separate the service's interstate and intrastate components, and the state regulation interferes with valid federal rules or policies.

Vonage Holdings Corp. v. Nebraska Pub. Serv. Comm'n, 564 F.3d 900, 904 (8th Cir. 2009) (preempting state regulation of nomadic interconnected VoIP service).

After reviewing the cited authorities, the R&R stated that one "cannot conclude as a matter of law, on the limited record presented by Defendants' motion to dismiss, that Charted Advanced would be foreclosed from relying on the impossibility exception simply because it offers a fixed [rather than a "nomadic"] VoIP service."  (Doc. No. 46 at 33.)  As the R&R explained, the Complaint alleges certain facts regarding the nature of Charter Advanced's provision of a VoIP service over a broadband Internet-capable cable, and that "[t]aking these allegations as true, it is plausible the impossibility exception could apply."  (Id. at 34.)

In Vonage II, the FCC concluded that the service at issue there provided "voice over Internet protocol (VoIP) service and other communications capabilities," such that the Commission could not separate the interstate from the intrastate communications.  19 F.C.C.R. 22404, 22404 ¶ 1 (2004).  The service at issue was "nomadic"–customers could

access the service via a broadband connection provided by another entity "any where in

the world where they can find a broadband connection to the Internet." Id. at 22406 ¶ 5

(characterizing the service at issue as "fully portable").  The FCC further stated that "to

the extent that other VoIP services are not the same as Vonage's but share similar basic

characteristics, we believe it highly unlikely that the Commission would fail to preempt

state regulation of those services to the same extent." Id. at 22404 ¶ 1.

Defendants, however, contend that the USF Order "repudiate[s] the Vonage II

dicta Charter seizes on," on which the R&R relied rather than the USF Order.  (Doc. No.

47 at 12 (citing Doc. No. 41 at 8-9).)  This Court does not understand the USF Order to

negate the Vonage II decision.  As the FCC stated in the USF Order, the Commission

recognized in Vonage II that "it is difficult for some interconnected VoIP providers to

separate their traffic on a jurisdictional basis," and that consistent with the arguments of

other VoIP providers and "based on the conclusions in the *Vonage Order*, we find that it

would be reasonable for us to treat the interconnected VoIP traffic as 100% interstate for

USF purposes."  21 F.C.C.R. 7518, 7544-45 ¶ 53.  Moreover, the FCC recognized that

"some interconnected VoIP providers do not currently have the ability to identify whether

customer calls are interstate." Id. at 7546 ¶ 56.  The FCC thus permitted such providers

to either "rely on traffic studies or the safe harbor provision" the FCC adopted, or, in the

alternative,

> to the extent that an interconnected VoIP provider develops the capability to
> track the jurisdictional confines of customer calls, it may determine the
> jurisdictional divide based on its actual percentage of interstate calls.  Under
> this alternative, however, we note that an interconnected VoIP provider

with the capability to track the jurisdictional confines of customer calls
would not longer qualify for the preemptive effects of our *Vonage Order*.

Id.

Contrary to Defendants' interpretation, the FCC did not negate or abandon Vonage

II, but simply further delineated the circumstances in which the Vonage II impossibility

exception would or would not apply.  Furthermore, the FCC noted that it had "not yet

classified interconnected VoIP as either a telecommunications service or an information

service," and that it did "not classify interconnected VoIP today."  Id. at 7547 ¶ 58.

Moreover, the FCC noted that "the Commission previously determined that

Vonage's interconnected VoIP service is a jurisdictionally mixed service in which part of

the service is interstate in nature."  Id. at 7540 ¶ 42 (citing the Vonage Order, i.e., Vonage

I).  "We believe that other interconnected VoIP services similarly are jurisdictionally

mixed."  Id.  While Defendants attempt to distinguish Charter Advanced's "fixed" service

from the "nomadic" service at issue in Vonage II, as the R&R recognized, the fact that

"the interstate and intrastate portions of the service *can be more easily distinguished*"

does not mean that a fixed service's portions "can always be distinguished, nor that it

would be economically feasible or easy to do so."  (Doc. No. 46 at 33.)  In short, while

"Vonage's nomadic interconnected VoIP service cannot be separated into interstate and

intrastate usage," such that the "impossibility exception is determinative," 564 F.3d 900,

905 (8th Cir. 2009), a fixed service might still be incapable of such separation, such that

the exception still applies.  And that determination is not appropriate here, given that "the

issue whether VoIP services can be separated into interstate and intrastate components is

a largely fact-driven inquiry requiring a high level of technical expertise." Vonage III,

483 F.3d 570, 579 (8th Cir. 2007).

Defendants contend that "[t]he USF Order plainly declares a fixed, interconnected

VoIP provider capable of tracking the jurisdictional confines of its customers calls is

subject to state regulation." (Doc. No. 47 at 10.) The Court disagrees, however, that

Charter Advanced's "own representations to consumers" disclose that it is capable of

such a distinction. Defendants rely on materials they submitted in support of their motion

to dismiss, but those materials–even if such were appropriate to consider on a Rule

12(b)(6) motion–simply state that if a customer dials 911, *the call will be routed directly*

*to the nearest public safety operator, and your address will be automatically provided*,

allowing the operator to dispatch help." (Doc. No. 17, Ex. C, at 121 (emphasis added).)

This statement–which Defendants only selectively quote–hardly establishes that the

automatic provision of a customer's address *to the 911 operator* somehow provides

Charter Advanced with the addresses of the recipients of other calls the customer would

make. And even if it would, it apparently could only do so if and when a particular

customer actually used the 911 service. Finally, Defendants' 911 argument establishes

nothing with respect to *non*-911 calls, which, of course, are the vast majority of calls.

And as the R&R explained, the FCC's recognition that "*even if Vonage could*

*directly identify the geographic location of [its] calls*," the costs and complexity of

determining the geographic location of calls transmitted through Vonage's "multifaceted

services" would prohibit any division of intra-state calls from inter-state calls, and that

this "impossibility" "could apply to some fixed services."  (Doc. No. 46 at 32-33.)

Furthermore, the R&R stated that the FCC has never directly repudiated its statement in

Vonage II that if the FCC were faced with other providers of "other types of IP-enabled

services having basic characteristics similar to [those at issue in Vonage II]," it would

"preempt state regulation to [a comparable] extent."  Vonage II. 19 F.C.C.R. at 22424 ¶

32; accord id. at 22404 ¶ 1 (stating belief that it would be "highly unlikely that [it] would

fail to preempt state regulation" of "other IP-enabled services having the same

capabilities").

### D.    Consideration of Matters of Public Record

Finally, Defendants contend that the R&R "flatly rejected consideration" of

documents they introduced at the public administrative proceeding before the MPUC, and

that, furthermore, the R&R's consideration of such materials is inconsistent because the

R&R credited "Charter's statements in the PUC proceeding."  (Doc.  47 at 13 & n.6.)  But

the R&R discloses no such error.  With respect to Charter's statements, the R&R simply

noted that Charter "does not dispute that its VoIP service is a fixed service, and it

conceded as much during the PUC proceeding *and again* in the hearing before" the

Magistrate Judge.  (Doc. No. 46 at 30 (emphasis added).)  Any additional reliance on

what it might have said at the PUC hearing is, at most, harmless error.

And with respect to the documents Defendants submitted at the PUC proceeding,

the R&R states that it "does not consider Defendants' evidence of Charter Advanced's

marketing or Charter Advanced's testimony to the PUC."  (Doc. No. 46 at 38 n.6.)

Defendants' reliance on <u>Great Plains Trust Co. v. Union Pac. R. Co.</u>, stating that the court, on a motion to dismiss under Rule 12(b)(6), "may consider documents attached to the complaint and matters of public and administrative record referenced in the complaint," 492 F.3d 986, 990 (8th Cir. 2007), is misplaced.  While the court is obligated to accept as true "the well-pleaded material factual allegations in the complaint," such a motion to dismiss is not the proper procedural juncture for consideration of a defendant's evidence, including any of a defendant's testimony at an antecedent administrative proceeding.  In short, the focus is on the complaint, not on a defendant's answer or other filings or materials offered in opposition to the allegations of the complaint.  And the Complaint here neither attaches any document nor references any such matters of public and administrative record other than the *fact of* the MPUC's decision that Charter's service is a "telecommunications service."  While a court may take judicial notice of another court's opinion, such notice is of "'the existence of the opinion, which is not subject to reasonable dispute over its authenticity,' but not of the facts summarized in the opinion." <u>McIvor v. Credit Control Servs., Inc.</u>, 773 F.3d 909, 914 (8th Cir. 2014).

## III.   CONCLUSION

Many of the matters at issue here involve questions of fact that are, of course, not appropriate for resolution on a Rule 12(b)(6) motion.  Moreover, Defendants' attempt to have these issues resolved as a matter of law by comparison to judicial decisions and FCC orders addressing other services ignores the FCC's case-by-case approach regarding particular services.  As the FCC itself has observed, "[t]he proper interpretation of the

terms 'telecommunications' and 'telecommunications service' in the 1996 Act raises difficult issues that are the subject of heated debate." Universal Service Report, 13 F.C.C.R. 11830, at ¶ 33.  In particular, "[t]he Commission has recognized the potential difficulty in determining the jurisdictional nature of IP telephony." AT&T Order, 7457 F.C.C.R. 7470 ¶ 20.  And with respect to mixed or hybrid services, it "recognize[d] that the question may not always be straightforward whether, on the one hand, an entity is providing a single information service with communications and computing components, or, on the other hand, is providing two distinct services, one of which is a telecommunications service." Universal Service Report, 13 F.C.C.R. 11830, at ¶ 60.

Accordingly, with one exception,[20] the Court denies Defendants' request that it modify the Report, reject the Recommendation, and grant their motion to dismiss.  The Court likewise denies Defendants' request that the Court vacate reference of Defendants' motion and rehear the matter *de novo*.  This Court notes, however, that denying Defendants' Rule 12(b)(6) motion simply determines that–in this highly fact-dependent and complex field–Defendants have not shown as a matter of law that, taking the allegations of the Complaint as true, Charter Phone is necessarily an "offering" of telecommunications.  Any such determination must await further proceedings.

---

[20]     Defendants note that Commissioner Betsy Wergin has been replaced by Commissioner Matthew Schuerger.  (Doc. No. 47, at 1 n.1.)  Accordingly, Commissioner Schuerger shall be substituted for former Commissioner Wergin.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendants' Objections to the Report and Recommendation [Doc. No. 47] are **OVERRULED**;

2.      The Report and Recommendation [Doc. No. 46] is, as discussed and modified above, **ADOPTED**;

3.      Defendants' Motion to Dismiss [Doc. No. 14] is **DENIED**; and

4.      Defendants' alternative request that this Court vacate the reference of their motion to the Magistrate [Doc. No. 47] is **DENIED**.

Dated:  July 5, 2016                              s/ Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Court Judge